**BORDEN, INC., Gooch Foods, Inc. and Hershey Foods Corp., Plaintiffs,**

**v.**

**UNITED STATES and United States Department Of Commerce, Defendant,**

**and**

**Delverde, SrL and Delverde USA, Defendant–Intervenors.**

Slip Op. 98–36.
Court No. 96–08–01970.

United States Court of International Trade.

March 26, 1998.

Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, David C. Smith, Jr., and John B. Brew), Washington, DC, for Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp.

Gilbert, Segall and Young LLP (Jeffrey E. Livingston and David D. Howe), New York City, for F.lli De Cecco di Filippo Fara San Martino S.p.A.

McKenna & Cuneo, LLP (Lawrence J. Bogard, Andrew E. Bej, and Malaika D. Carter), Mound, Cotton & Wollan, (Constantino P. Suriano), Washington, DC, for Delverde, SrL and Delverde USA.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice (Lesleyanne Koch Kessler), Dean Pinkert, Attorney–Advisor, Office of Chief Counsel for Import Administration, U.S. Dept. of Commerce, of counsel, Washington, DC, for Defendant.

### *OPINION*

RESTANI, Judge.

This matter is before the court on cross Motions for Judgment on the Agency Record, pursuant to USCIT Rule 56.2, by Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp. (collectively "Borden" or "the domestic industry") and Delverde, SrL and Delverde USA, Inc. (collectively "Delverde"). This matter is also before the court on a Motion for Judgment on the Agency Record by F.lli De Cecco di Filippo Fara San Martino S.p.A. ("De Cecco"). The International Trade Administration, U.S. Department of Commerce's ("Commerce" or "the agency") determinations under review are *Certain Pasta from Italy*, 61 Fed.Reg. 30,326 (Dep't Commerce 1996) (final determination) ["*Final Determination*"] and 61 Fed.Reg. 38,547 (Dep't Commerce 1996) (amended final determination and antidumping order).

Borden asks the court to find that Commerce erred in failing to calculate dumping margins for Delverde using transactionspecific export prices, rather than weighted-average prices, pursuant to 19 U.S.C. § 1677f–1(d)(1) (1994), the "targeted dumping" provision. Borden also challenges Commerce's commission offset methodology.

Delverde argues that Commerce, during Delverde's level of trade inquiry, unlawfully denied its request for a constructed export price ("CEP") offset, an adjustment to normal value which Delverde claims would have led to a *de minimis* dumping margin. The

defendant agrees in part and requests a remand to correct analytical errors. Defendant-intervenor Borden opposes this request. Delverde also argues that Commerce erred in rejecting the capital asset depreciation expense component of the cost of production data submitted by Delverde affiliate Tamma Industrie Alimentari, SrL ("Tamma").

De Cecco asks the court to review the 46.67% antidumping margin assigned to it by Commerce based on an "adverse facts available" analysis.

The court considers issues raised by Borden, Delverde, and De Cecco separately, in that order. The facts relating to each issue will be stated separately.

## JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

The court must uphold Commerce's Final Determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994).

### I. Borden

#### A. Targeted Dumping Investigation

#### Background

On May 12, 1995, Borden filed a petition with Commerce seeking the imposition of antidumping and countervailing duties against certain pasta from Italy, pursuant to 19 U.S.C. § 1677f–1(d)(1)(B). *Certain Pasta from Italy,* 60 Fed.Reg. 30,268, 30,268 (Dep't Commerce 1995) (notice of initiation of investigation). Borden used average weekly retail prices to demonstrate that, for all Italian exporters, certain regions of the United States experienced significantly different pricing than others, submitting that this suggested targeting [1] and justified the use of individual (*i.e.* transaction-specific) export prices rather than weighted-averages to detect dumping without masking target-

ing. *Letter from Borden to Commerce* (Oct. 20, 1995), P.R. 355, Pl. Borden's App., Tab 4. Commerce initiated a sales at less than fair value ("LTFV") investigation on June 1, 1995. *Certain Pasta From Italy,* 60 Fed. Reg. at 30,268. Commerce found Borden's attempts to demonstrate targeting insufficient reason to depart from its normal methodology and employ instead a comparison with transaction-specific prices. *Final Determination,* 61 Fed.Reg. at 30,329. Commerce did not perform an independent targeted dumping analysis of the data. Commerce did find a 2.8% dumping margin using the weighted-average to weighted-average comparison. *Id.* at 30,365. On February 14, 1997, Borden moved for Judgment on the Agency Record, alleging that Commerce erred in refusing to conduct a transaction-specific comparison and that such a comparison would have produced a dumping margin of 6.14%. Pl. Borden's Br. at 6.

### Discussion

The issue before the court is whether Commerce erred in rejecting Borden's targeted dumping allegation due to the inadequacy of Borden's pricing pattern evidence. The court concludes that Commerce erred by failing to articulate the methodology or standards by which a targeted dumping allegation would be judged and failed to clearly allocate burdens of production and analysis in the targeting context.

#### 1. Transaction-Specific Price Comparisons, Not Weighted–Average Price Comparisons, are the Exception Requiring Justification

Section 1677f–1(d)(1) of Title 19 of the United States Code describes the LTFV price comparison analysis. The first part of the section describes the normal methodology.

#### (A) In general

[T]he administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value –

the at– or above–cost prices charged to other customers or regions or at other times. *See* 19 U.S.C. § 1677f–1(d)(1)(B).

---

**1.** Targeted dumping is the practice of systematically selling below cost to selected customers or regions or at selected times, as compared with

(i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or

(ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

19 U.S.C. § 1677f–1(d)(1)(A). The statute continues with a description of conditions under which Commerce might deviate from this method. 19 U.S.C. § 1677f–1(d)(1)(B).

**(B) Exception**

■ The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if –

(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

*Id.* Commerce reasonably interprets the statute to mean that the weighted-average to weighted-average comparison is the normal method required by law, but that it may, though is not required to, deviate from this requirement under certain conditions and then only upon explicit justification of its decision.

Borden's opposite interpretation, that Commerce must default to the transaction-specific methodology and justify its use of weighted-average price comparisons, is not borne out by the statutory language. 19 U.S.C. § 1677f–1(d)(1)(B)(ii). The practice Borden recommends is contrary to law as it now exists; it reflects the law as it was prior to the changes enacted by the Uruguay Round Agreements Act ("URAA"). Pub.L. No. 103–465, 108 Stat. 4809 (1994). State-

ment of Administrative Action accompanying the URAA, at 842, H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ("SAA"). Borden quotes the SAA selectively:

> Although current U.S. law permits the use of averages on both sides of the dumping equation, Commerce's preferred practice *has been* to compare an average normal value to individual export prices in investigations and reviews. In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal "targeted dumping." In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.

SAA at 842 (emphasis supplied). The passage continues, however, to describe as normal the methodology set forth in 19 U.S.C. § 1677f–1(d)(1)(A).

> Consistent with the Agreement, new [19 U.S.C. § 1677f–1(d)(1)(A) ] provides that in an investigation, Commerce normally will establish and measure dumping margins on the basis of a comparison of a weighted-average of normal values with a weighted-average of export prices or constructed export prices.

SAA at 842. The SAA explains that the exception to the normal methodology is an antidote to targeted dumping:

> New [19 U.S.C. § 1677f–1(d)(1)(B) ] provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, *i.e.*, where targeted dumping may be occurring. Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Com-

merce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.

*Id.* at 843.

Averages allow higher prices to cancel out some amount of dumping, *see Potassium Chloride from Israel,* 50 Fed.Reg. 4,560, 4,562 (Dep't Commerce 1985) (final determination), but transaction-specific price comparisons are statistically biased toward a dumping finding, as high priced sales are disregarded, and only the lower priced ones are included in the calculation. Congressional Budget Office, *How the GATT Affects U.S. Antidumping and Countervailing Duty Policy,* 33–35, 66 (1994).

> [The transaction-specific methodology] contains a statistical error that will yield a positive average margin of dumping in every real-world situation except the one that would take place if every single transaction (including both the home market and U.S. sales) during the ... period of investigation occurred at the same price....
>
> If the true margin of dumping is quite high, say, 20 percent, this statistical bias will not be very large.... However, if the estimated margin of dumping is small, the bias could be several times the magnitude of the true margin of dumping; in such cases it is more likely that no dumping exists.

Tracy Murray, *The Administration of the Antidumping Duty Law by the Department of Commerce, in Down in the Dumps* 23, 36–37 (Richard Boltuck & Robert E. Litan eds., 1991). Economists and politicians argued masking versus amplifying during the Uruguay Round. *See* Congressional Budget Office, at 33–35, 66; Murray at 36–37. Borden's argument revisits that debate. At the

Uruguay Round, the U.S. argued, consistent with its past administrative practice, that comparisons using weighted-average prices mask dumping. *Trade Agreements Resulting from the Uruguay Round of Multilateral Trade Negotiations: Hearings before the Committee on Ways and Means and its Subcommittee on Trade,* 103d Cong. 73, at 401 (1994) (statement of Jeffrey E. Gartner, Under Secretary of Commerce for International Trade) [*"House Hearings "*]. The prevailing view, however, which was made part of U.S. domestic law through the URAA, was that transaction-specific comparisons ran the different risk of amplifying dumping margins. *See* URAA, Pub.L. 103–465, § 219; 108 Stat. 4855–57 (1994).

During the Uruguay Round meetings, the U.S., out of concern that targeted dumping might be masked by weighted-average to weighted-average comparisons, insisted upon a provision in the international agreement on antidumping *permitting* the use of individual export prices in investigations when targeting is occurring. *House Hearings,* at 401. Despite the inclusion of this provision, the fact remains that antidumping law under the URAA instructs Commerce to be more concerned about amplification of dumping margins through the use of transaction-specific prices than about masking them with averaging.[2] *Serampore Industries Pvt., Ltd. v. United States,* 11 CIT 866, 874, 675 F.Supp. 1354, 1360–61 (1987) (agency practice of excluding non-dumped sales is to prevent a foreign producer from masking dumping) and *Drycleaning Machinery from Germany,* 56 Fed.Reg. 66,838, 66,840 (Dep't Commerce 1991) (final results of antidumping duty administrative review) (averaging rejected because of masking of dumping), upon which

---

**2.** Borden makes various other arguments. Ignoring the requirements of the statute, Borden argues that Commerce should use transaction-specific price comparisons because foreign companies are required to report transaction-specific data. *See* SAA at 843. Thus, Commerce would only need to program its computer appropriately. Similarly, Borden argues that the basic goal of the antidumping law is to calculate dumping margins "as accurately as possible," *see Magnesium Corp. of America v. United States,* 938 F.Supp. 885, 902 (C.I.T.1996) (quoting *Rhone*

*Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Cir.1990)), and that failure to examine individual export prices where targeting has occurred is inconsistent with that purpose. Such a statement may be accurate but begs the question of whether targeting occurred. As already explained, the law no longer mandates the use of transaction-specific data *just in case* targeting has occurred, rather the reverse. Where there is no finding of targeting, the statute directs Commerce to use weighted-average prices, notwithstanding their potential masking effect.

Borden relies, no longer represent normal practice.

## 2. Commerce Rejection of Borden's Targeting Allegations

Each of three times Borden submitted a petition alleging targeting, Commerce articulated various reasons for rejecting it. Commerce advised Borden, after its first submission, that targeted dumping analyses should be company-specific, based on product-, not brand-specific calculations, and should use exporter, not retail prices. *Memorandum from Team to Barbara R. Stafford* (Nov. 8, 1995), at 2, P.R. 440, Pl. Borden's App., Tab 5 at 2. Borden's first revision was criticized for its weak statistical analysis that demonstrated price differences but not a pattern. *Memorandum from Team to Barbara R. Stafford* (Dec. 8, 1995), at 2, P.R. 507; Pl. Borden's App., Tab 8, at 3. Commerce faulted Borden's second revision for failing to address the statutory criteria of 19 U.S.C. § 1677f–1(d)(1)(B)(ii). *Final Determination,* 61 Fed.Reg. at 30,329. Specifically, Commerce noted that Borden failed to demonstrate a pattern of significant price differences, predetermined the results through customer groupings, failed to provide benchmark prices, and failed to explain why the demonstrated price differences could not be accounted for by weighted-average comparisons. *Id.* Commerce thus found the pattern of demonstrated price differences to be "predetermined" by the initial composition of the customer groups, that the domestic industry failed to supply any relevant "benchmark" prices that would demonstrate the "significance" of price variations, and that the analysis did not address the statutory criteria of 19 U.S.C. § 1677f–1(d)(1)(B)(ii). *Final Determination,* 61 Fed.Reg. at 30,329. Commerce concluded that statistical flaws in Borden's analysis precluded a finding of the requisite pattern of pricing differences indicative of targeting. *See id.* The record shows Borden failed to remove outliers, *Letter from Delverde to Commerce* (Dec. 4, 1995), at 6, C.R. Doc. 179; Def.-Int. Delverde's App., at AII–13, presumed the existence of a pattern and manipulated the data to show it, *Letter from Borden to Commerce* (Feb. 13, 1996), Pub. A.R. 680, Pl. Borden's App., Tab 9, at 7, and failed to standardize the data, for example, by running regressions, to account for or rule out differences that could be explained by factors other than targeted dumping. Borden did not control for volume or customer status. Borden also failed to prove the null hypothesis, which would have shown the intrinsic probability of finding a pattern even where none existed. Instead, Borden simply grouped customers by price and performed univariate and linear modeling procedures. *See id.*

Borden complains that Commerce rejected its revised petitions, despite Borden having addressed all the concerns Commerce raised regarding Borden's first petition. In raising those concerns, Commerce did not guarantee a particular finding, even upon Borden's strict conformity of its revised petition with Commerce's response. At best, Commerce's criticism of the first petition amounted to an incomplete expression of minimum conditions for an effective petition, not a roadmap toward an affirmative finding.

Commerce found the results in Borden's third petition predetermined because Borden grouped the customers by price and then used statistical methods to show differences in price between the groups. *Final Determination,* 61 Fed.Reg. at 30,329. Borden understood Commerce as having *required* such grouping when Commerce instructed Borden not to examine each of the multitude of transactions individually. Pl. Borden's Br. at 26. What Commerce *did* say was that there was a statutory preference for weighted-average price comparisons and that simple averages might distort where certain individual customers had a great number of transactions. *Memorandum from Team to Barbara R. Stafford* (Dec. 8, 1995), at 3, P.R. 507, Pl. Borden's App., Tab 8, at 3. Grouping the data by price, Borden's results better reflected its method than the data. Borden's statistical analysis demonstrated the existence of price variation, showing a distribution but not a pattern. *See Final Determination,* 61 Fed.Reg. at 30,329. Even if Borden had found a pattern, its analytical technique would have been too simple to convey the statistical significance of its findings. Commerce concluded that Borden's petitions failed to show targeting, because

they failed to employ analytical techniques which could have shown it.

Borden did not understand the targeted dumping provision in the statute, in part for the failure to understand what targeting is. Borden considers targeted dumping "the practice of selling to selected customers or regions at different and preferential prices as compared to the prices charged to other customers or regions." Pl. Borden's Br. at 7. Thus, Borden searched for statistical evidence of price *variance*. By Borden's definition, however, *most* pricing would constitute targeted dumping, in that there is price variance along multiple dimensions in many markets. Certainly, not all price variation, not even all statistically significant variation, results from targeted dumping. The concept of targeted dumping is that a company might not be able to, or might choose not to, use a dumping strategy toward a whole market but might strategically focus on a more narrowly defined market. Michael Coursey, *Comment, in Down in the Dumps*, at 240. To ferret out this more complicated dumping, the statute instructs Commerce to look not only at the *magnitude* of price variance but also for a *pattern* of significant price differences. 19 U.S.C. § 1677f–1(d)(1)(B)(i). Nonetheless, Commerce failed from the outset to convey standards for satisfying the statute.

Borden also maintains that, contrary to Commerce's view, the weighted-average price Borden submitted was adequate to establish a benchmark price. Commerce appears to have wanted a U.S. price for comparison. *Final Determination* at 30,329.

Using the average for comparison shows only divergence from the average price, highlighting the magnitude of price variation, but not demonstrating a pattern.[3]

Commerce complained that Borden failed to demonstrate that price differences could not be taken into account using weighted-average prices. Borden intended its presentation of the masking effect of averaging to satisfy this requirement. Because Commerce did not understand Borden to have provided evidence of targeting at all, Commerce was not satisfied that Borden had made an adequate showing that the targeting would be masked by averaging.

■ Even if Commerce accepts Borden's targeted dumping petition, however, the agency would not necessarily err in rejecting transaction-specific methodology. 19 U.S.C. §§ 1677f–1(d)(1)(A)–(B). Commerce "*shall* [compare] ... the weighted average of the normal values to the weighted average," 19 U.S.C. § 1677f–1(d)(1)(A)(i) (emphasis supplied), but Commerce "*may* [compare] ... the weighted average of the normal values to the export prices ... of individual transactions for comparable merchandise," 19 U.S.C. § 1677f–1(d)(1)(B) (emphasis supplied). Under the appropriate circumstances Commerce has the discretion to *not* apply the targeted dumping exception to its normal methodology, even upon a finding of targeted dumping.[4]

### 3. Commerce Has Not Fulfilled Its Duty to Articulate Standards

■ Whether Commerce was reasonable or not in thrice rejecting Borden's allegation,

---

3. Borden also contends that Commerce erred in failing to examine the nature of the pasta industry to determine the significance of the pricing patterns in that context. The legislative history does reveal an intent that Commerce examine targeted dumping "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 843. Borden contends that, as a fungible commodity, pasta is particularly price sensitive, meaning small differences in price are significant. Therefore Commerce's failure to examine pasta price differences in light of the industry could distort their importance. This argument is premature; no pattern has been identified, the magnitude of which Commerce might need to consider in the context of industry pricing.

4. Borden also maintains that the legislative history reveals a preference, within this discretion, for transaction-specific comparisons.

The statute and the SAA set forth the congressional intent that Commerce rely on transaction-specific U.S. prices rather than average U.S. prices where targeting occurs so that actual margins of dumping are not masked by the use of averaging.

Pl. Borden's Br. at 7. However, granting Commerce the *discretion* to choose, in certain cases, to employ transaction-specific methods—and then only with an explanation of the use of the exceptional practice—far from implies a congressional preference for it.

the court finds that in rejecting the targeting petition on methodological grounds, Commerce never reached the question of whether the data submitted by Delverde revealed a pattern of price differences adequate to trigger transaction-specific price comparisons. Commerce concluded merely that methodological inadequacies in Borden's three petitions precluded a finding of targeting based on that methodology. Under the URAA, however, Commerce may not abandon the targeting inquiry simply because of a petitioner's lack of statistical sophistication. *See* 19 U.S.C. § 1677f–1(d)(1)(B). Despite pointed questioning at oral argument, defendant could not describe in a clear way how targeting could be demonstrated. Commerce has only said what it does not want; it has not made clear what it requires. Thus, the court is not convinced that Commerce is fulfilling its duty to rationally decide whether it should perform a transaction-specific investigation when the statutory prerequisites are met. Indeed, Commerce has not answered several critical questions: What methods could show targeting? By what standards does Commerce evaluate correctly analyzed data? What does Commerce deem a pattern significant enough to constitute evidence of targeting? Would acceptable methods, applied to the Delverde data, reveal targeting?

Commerce failed to articulate the standards by which it would determine that a "pattern of export prices" that "differ significantly" did or did not exist. *Id.* Commerce was obliged to articulate the standards on which it based its decision. *National Steel Corp. v. United States,* 18 CIT 1126, 1132–33, 870 F.Supp. 1130, 1136–37 (1994) (remand to Commerce to articulate standards for determining "non-aberrant" margins where agency failed to provide explanation of term). While the negative rationale Commerce gives for rejecting Borden's final petition may be reasonable when viewed in isolation, the demand by the domestic industry for standards is no less reasonable.

The court finds that Commerce erred in failing to articulate the standards by which it will evaluate the targeted dumping petitions. To facilitate future inquiries, Commerce will need at some point to explain what targeted dumping is, what methods will identify or rule out the pricing patterns referred to by the statute, what degree of significance in those patterns will trigger Commerce to exercise its discretion to make a case-by-case determination to depart from its normal methodology, and on what basis it will make that decision. For example, regarding the significance of the pattern, bearing in mind that Congress intended a case-by-case analysis with reference to variations in price sensitivity by industry, SAA at 843, Commerce might suggest a calculus which relates pricing patterns with price elasticity.

In May 1997, Commerce independently announced its intention to issue policy bulletins setting forth specific criteria for targeted dumping "as the Department develops its practice in this area." *Antidumping Duties; Countervailing Duties,* 62 Fed.Reg. 27,296, 27,374 (Dep't Commerce 1997) (final rule) [*"Final Rule"*]. Recognizing that Commerce as yet may not be prepared to articulate a methodology to be employed by domestic industries alleging targeting generally, and in light of its expressed intention to issue new regulations, *id.,* the court leaves it to Commerce to decide, on remand, whether to articulate the standards by which it evaluates a domestic industry's targeted dumping petitions, in general or for only this case, or to conduct its own analysis to determine whether there is targeted dumping based on the data submitted by respondent.

The court has considered Borden's assertion that Commerce, not the domestic industry, was obliged by statute to assess whether targeted dumping had occurred and that Commerce therefore improperly shifted its own burden to Borden by denying Borden's petition solely on the inadequacies of Borden's analysis, without itself examining the data to which it had equal access. The government rejoins that Commerce was reasonable in requiring a minimally sufficient allegation of targeted dumping from the domestic industry prior to proceeding with its own inquiry into targeted dumping. The SAA refers to the collection of transaction-specific data "so Commerce may determine ... whether the exception for targeted dumping is applica-

ble." SAA at 843. This does not clarify whether Commerce would make its determination on the basis of its own or the domestic industry's analysis. The statute is silent in that regard. 19 U.S.C. § 1677f–1(d)(1)(B).

The court will not dictate the division of labor between Commerce and the domestic industry; Commerce is better positioned to decide that issue. In the absence of statutory direction as to the allocation of responsibility between Commerce and the domestic industry in a targeted dumping inquiry, the matter is left to Commerce's discretion to develop some reasonable system. *Chevron USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus far, Commerce has not clearly explained its allocation of responsibility for performing the targeting analysis. Commerce has recently spoken somewhat mysteriously of the "assistance of the domestic industry." *Final Rule,* 62 Fed. Reg. at 27,374. Unless Commerce determines that it will perform its own analysis based on the data on hand, Commerce shall specify what burden it assigns petitioners.

## 4. Pricing Pattern Standards

In a sub-argument relevant to its targeting challenge Borden asserts that Commerce's application of different standards as to targeted dumping and the level of trade ("LOT") adjustment is in error. The court is not convinced that the "rigid" standard employed by Commerce in analyzing the domestic industry's allegations of a pattern of price differences for purposes of targeted dumping and the allegedly inconsistent "liberal" standard applied when analyzing a pattern of export prices in the LOT context taken together constitute error. *See* Pl. Borden's Br. at 9. Because the domestic industry's allegation of a pattern of price differences to show targeted dumping allegedly "met and surpassed" the standards Commerce accepted as showing a pattern of price differences in its LOT analysis, Borden calls Commerce's decision to accept the pricing patterns for LOT but to reject them for targeted dumping arbitrary and capricious.[5] Pl. Borden's Br. at 10.

Commerce is instructed that a LOT adjustment may be made if the existence of different selling functions "is demonstrated to affect price comparability, based on a *pattern of consistent price differences*" relating to different selling practices at different levels of trade. 19 U.S.C. § 1677b(a)(7)(A)(ii) (1994) (emphasis supplied).[6] Individual export prices may be used for comparison under the targeted dumping provision if Commerce finds "there is a *pattern of export prices* (or constructed export prices) for comparable merchandise *that differ significantly* among purchasers, regions, or periods of time." 19 U.S.C. § 1677f–1(d)(1)(B)(i).[7] Borden refers to the language of these two statutory directives as "almost identical" and

---

5. Borden also objects that in the LOT context Commerce "independently investigated aggregate sales information to determine whether a pattern of price differences existed...." Pl. Borden's Br. at 9. Borden's division of labor argument has already been addressed in the previous section.

6. The statute provides, in relevant part:

(A) The price described in paragraph (1)(B) shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) ... that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade—
 (i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a *pattern of consistent price differences* between sales at different levels of trade in the country in which normal value is determined.
19 U.S.C. § 1677b(a)(7)(A) (emphasis supplied).

7. The statute provides, in relevant part:
 (B) **Exception**
 The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
 (i) there is a *pattern of export prices* (or constructed export prices) for comparable merchandise *that differ significantly* among purchasers, regions, or periods of time ...
19 U.S.C. § 1677f–1(d)(1)(B) (emphasis supplied).

their application "very different and inconsistent." Pl. Borden's Br. at 9.

In an elaborate, if contradictory, textual analysis, Borden argues that identical words used in different parts of the same statute are intended to have the same meaning. Borden contends that the difference between the "almost identical" provisions is the use of the word "consistent" in 19 U.S.C. § 1677b(a)(7)(ii) and "significantly" in 19 U.S.C. § 1677f–1(d)(1)(B). Relying on the dictionary, Borden argues that the word "consistent" should connote a higher, more rigorous standard than "significant." Significant merely means "a noticeably or measurably large amount" or "caused by something other than mere chance;" whereas consistent means "showing steady conformity." *Webster's Ninth New Collegiate Dictionary*, at 1096, 280 (1985).

Price differences *can* be "consistent" without being "significant," as when prices to all end-users exceed all prices to wholesalers by a very small percentage. Likewise, prices can differ "significantly" without doing so "consistently," as in the case of a customer whose price exceeds that of another by 20% one week but is 25% lower the next.

 It is correct that where the identical word or phrase is used more than once in the same act, there is a presumption that they have the same meaning. *See Sutherland Stat. Const.* § 46.06 (5th Ed. 1992) at 119, 120; *Cemex, S.A. v. United States*, 16 CIT 251, 254, 790 F.Supp. 290, 294 (1992), *aff'd*, 989 F.2d 1202, 1993 WL 26767 (Fed.Cir.1993) (court may apply parallel constructions where phrase appears more than once in same statutory provision); *Champagne v. United States*, 35 Fed. Cl. 198, 210 (1996) ("common sense requires that the same words used twice in the same act should have the same meaning."). This rule is tempered, however, by the canon that the same word or phrase can possess different meanings in different contexts. *See Cemex*, 16 CIT at 254, 790 F.Supp. at 294 ("[w]here, however, the contexts and purposes of the provisions differ, parallel constructions are inappropriate"); *New England Telephone and Telegraph Co. v. Public Utilities Commission of Maine*, 742 F.2d 1, 7 (1st Cir.1984) (constru-

ing the identical word differently because there existed a "sufficient difference in the functions of the two sections to justify assigning a different scope to the same word."), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 988 (1986).

 Commerce concedes that different methodologies were used in the LOT adjustment to normal value reported by Commerce in the *Final Determination*, 61 Fed.Reg. at 30,331, and Commerce's denial of Borden's targeting petition, Pl. Borden's Br. at 30, but that difference was justified and permitted, because the two provisions differ in ways that render the different standards appropriate. The way Commerce treats patterns of price differences for purposes of LOT adjustments is largely irrelevant to a targeted dumping allegation. Moreover, the LOT adjustment inquiry is mandatory and standard, while the targeted dumping provision is guiding and an exception. The standards are understandably different because they were designed for different circumstances, one of which is the norm and the other an exception. The targeted dumping statute, which is *labeled* "exception," includes the additional requirement that Commerce show why there should be a deviation from the normal procedure. 19 U.S.C. § 1677f–1(d)(1)(B). Commerce "may" deviate from the normal methodology defined in 19 U.S.C. § 1677f–1(d)(1)(A) if the conditions for the exception are met *and*

the administering authority explains why such differences cannot be taken into account using [the normal, weighted-average to weighted-average or transaction-specific to transaction-specific comparison] a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f–1(d)(1)(B)(ii). This itself justifies application of a stricter standard in that inquiry.

**B. Challenge to Offset of the Difference in Commissions in the United States and Foreign Markets.**

 Pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii) (1994) and 19 C.F.R. § 353.56(a)(2) (Apr. 1, 1996), Commerce adjusted normal value for differences in the circumstances of sale between sales of pasta

made to the United States and sales made in Italy. *See Final Determination Calculation Memorandum* (June 3, 1996), P.R. Doc. 848, Def.-Int. Borden's App., Tab 54; *Final Margin Computer Printout*, at lines 292–95, C.R. Doc. 407, Pl. Borden's App., Tab. 10. Where there were commissions in both markets, the agency did not simply adjust for the difference in commission expenses incurred by adding U.S. direct expenses to and deducting foreign market direct expenses from normal value, but instead added home market indirect selling expenses to home market commissions to offset the additional commissions incurred in selling to the United States. *See id.*

Commerce's methodology was the same in both the Preliminary and Final Determinations. *See Certain Pasta from Italy*, 61 Fed. Reg. 1,334, 1,349 (Dep't Commerce 1996) (preliminary determination); *Preliminary Determination Calculation Memorandum* (Dec. 14, 1995), at 7, Def.-Int. Delverde's App., at A–62.

Although Borden noted, as a clerical error after the Final Determination, Pl. Borden's Reply Br. at 14, that the calculations did not match the Final Determination language, this does not amount to a timely challenge to the actual methodology used. If the language used in the Final Determination is in error, it may be corrected, but the methodology actually employed was set early on and could not be challenged for the first time after the Final Determination. If the challenge had been timely raised, Commerce could have addressed it before the Final Determination. Accordingly, this challenge is rejected for failure to exhaust administrative remedies. 28 U.S.C. § 2637(d) (1994).

## II. Delverde

### A. Depreciation Recalculation

#### Facts

Commerce examined Delverde affiliate Tamma's data in the course of evaluating Delverde's costs of production. In 1994, Tamma revised its method of calculating its depreciation to double the useful lives of the company's assets. *Tamma Verification Report for Cost of Production and Constructed Value Data* (Apr. 19, 1996), at 27–28, Pl. Delverde's App., at AII–1–2. These changes were made for income tax purposes. *Final Determination*, 61 Fed.Reg. at 30,354. The relevant effect of changing the rate of depreciation of Tamma's productive capital assets is to reflect lower marginal production costs, permitting comparison with lower export or constructed export prices without a finding of dumping.

Commerce rejected the new calculation as not standard for antidumping inquiries and substituted a depreciation calculation consistent with its normal calculation of depreciation in antidumping investigations. *Final Determination*, 61 Fed.Reg. at 30,354–55. Calculations based on Tamma's calculation allegedly would result in a *de minimis* dumping margin.

#### Discussion

The basic rules for the calculation of cost of production, 19 U.S.C. § 1677b(b)(3) (1994), are supplemented by 19 U.S.C. § 1677b(f)(1)(A) (1994), referring specifically to depreciation in the antidumping context.

Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

19 U.S.C. § 1677b(f)(1)(A). This approach to accounting standards is consistent with pre-URAA practice. SAA at 834. The SAA provides further detail regarding when it may be appropriate for Commerce to reject a reported depreciation, even though the reported depreciation meets the first statutory condition of consistency with home country

accounting standards. *Id.; see also* 19 U.S.C. § 1677b(f)(1)(A).

In determining whether a company's records reasonably reflect costs, Commerce will consider U.S. generally accepted accounting principles employed by the industry in question. For example, a company's records might not fairly allocate the cost of an asset if a firm's financial statements reflect an extremely large amount of depreciation for the first year of an asset's life, or if there is no depreciation expense reflected for assets that have been idle. In such a situation, it would be appropriate for Commerce to adjust depreciation expenses. Costs shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review.

SAA at 834–35; *see also Certain Cold–Rolled and Corrosion–Resistant Carbon Steel Flat Products from Korea,* 62 Fed.Reg. 18,404, 18,443 (Dep't Commerce 1997) (final results of antidumping duty administrative review) (allocation based on home country accounting practice rejected for not accurately capturing costs). In other words, the SAA counsels Commerce to refer to U.S. GAAP, as employed by the importer's industry generally, as a guide to the reasonableness of the importer's allocations based on home country accounting principles. SAA at 834–35. The SAA further contemplates that Commerce will make adjustments when it concludes that the importer's calculations do not reasonably reflect costs. *Id.*

In the original investigation, Commerce considered the depreciation methods presented in Tamma's cost of production response. At verification, the Department found that Tamma had replaced its former depreciation schedule, based on industry-specific asset lives authorized under the Italian Civil Code and GAAP, with a new, more tax-beneficial, while still Italian GAAP consistent, deprecia-

tion schedule. *Final Determination,* 61 Fed. Reg. at 30,354.

Commerce rejected Tamma's reported depreciation method, as "contrary to sound accounting principles and the Department's practice." *Id.* at 30,355. Commerce reasoned that the methodological change "was not the result of new events, changing conditions, experience, or additional information." *Id.* at 30,354. Instead, Commerce concluded that the change distorted costs for the purposes of an antidumping analysis, and implied that the change was inconsistent with the Italian Civil Code standards for calculating the useful life of assets for the pasta industry. *Id.* Thus, Commerce substituted a depreciation calculation consistent with its normal practice in antidumping investigations. *Id.* at 30,333.

Delverde argues that, in rejecting its revised capital asset depreciation expenses, Commerce disregarded its statutory obligation under 19 U.S.C. § 1677b(f)(1)(A) to use a respondent's reported costs where such costs are maintained in conformity with home market GAAP, are according to the company's historical use, and reasonably reflect the cost of producing subject merchandise. Delverde presents the new calculations as historical, alleging that Tamma changed to the new method before the commencement of the antidumping investigation.[8] The home country legality (i.e. conformity with Italian GAAP) of the new calculation is evidenced, according to Delverde, by the approval of Tamma's local auditors. (Of course, they approved the earlier method, selected by Commerce here, as well.) Finally, Delverde argues that the true cost of production is represented by the new calculation because the new method extends the period of depreciation to more closely approximate the age of certain fixed assets associated with production, namely Tamma's decades old pasta factory and wheat mill.[9]

---

8. Borden contests whether the changes were indeed made prior to the investigation, in light of the particularities of Tamma's financial schedule. The investigation began in May 1, 1994, and Tamma's calculations had to be made in June 1994, effective at the earliest December 1994. Borden's Resp. Br. at 85 fn. 287.

9. The ages noted are [ ] and [ ] years, respectively. The changed calculation, as Borden notes, was applied not only to Tamma's factory buildings, but to *all* of its assets, including manufacturing equipment. *Final Determination,* 61 Fed. Reg. at 30,354. Delverde responds that Tam-

The court finds the statutory mandate to Commerce under 19 U.S.C. § 1677b(f)(1)(A) to be relatively flexible. The court reads the statutory instruction to clearly state what factors Commerce *shall consider* but to leave to Commerce's judgment what relative weight and meaning to give them.

■ First, the question of any alleged bad faith behind Tamma's changed calculation is not at issue here, regardless of whether the change occurred prior to or during the pasta investigation. Questions of timing and motivation simply distract from the central concern, which is the accuracy of the calculations. Commerce's mention of the motivation issue, however, is not reversible error, as that was not the focus of its decision. Commerce could, as it did, find Tamma's tax-based reason to change from an otherwise acceptable useful life to be some evidence of distortion in the absence of evidence of new events, changing conditions, experience, additional information, or a change in underlying economic assumptions which would relate the change to accurate cost accounting. This is not necessarily an additional affirmative legal burden on respondent, though a respondent such as Delverde might find it advisable and persuasive to present an explanation for an otherwise seemingly arbitrary change.

■ Second, Commerce properly determined that Tamma's calculation was not historical. Delverde wanted Commerce to read "historically" to mean "in the normal course of business," Pl. Delverde's Reply Br. at 13, but Commerce was entitled to do otherwise, provided its interpretation was reasonable. The term historical can be variously under-

stood to mean prior to the period of inquiry, not in immediate anticipation of the investigation, or long-standing industry practice. These variations suggest some ambiguity to the term, leaving Commerce free to choose an interpretation.

■ Third, the statutory directive is conditional, requiring Commerce to use the company's own calculation only if satisfied with the accuracy of the cost representations they render. The government contends that Tamma calculated the useful life of its assets and then altered that calculation, albeit as allowed by Italian GAAP, rendering the calculations inaccurate. Further, Tamma's auditor's approval of prior use of the calculation Commerce did apply was part of the evidence upon which Commerce could rely reasonably for an accurate reflection of production costs. After weighing the less than clear evidence, Commerce did not agree that Tamma's new calculations accurately reflected its costs. Thus, it was not obliged to accept them, and could resort to the prior figures.

The court finds no error in Commerce's rejection of the new calculation. Commerce was entitled to reject the revision on the basis of its factual findings, namely that the new calculation was not in accord with Tamma's historical practice and did not reflect costs accurately.[10]

## B. Level of Trade Adjustment and CEP Offset [11]

### Facts

Commerce issued a questionnaire to exporters of pasta from Italy, including Del-

---

ma's other machinery was of comparable age. Pl. Delverde's Reply Br. at 14.

**10.** Delverde also suggests that Commerce diverged from its own historical practice. The cases Delverde cites in which Commerce used depreciation calculations consistent with foreign GAAP do not in any way contradict the agency's refusal to do so where it deems they misrepresent costs. *See Small Diameter Circular Seamless Carbon and Alloy Steel, Standard, Line and Pressure Pipe from Italy,* 60 Fed.Reg. 31,981 (Dep't Commerce 1995) (final determination); *see also Canned Pineapple Fruit from Thailand,* 60 Fed. Reg. 29,553 (Dept. Commerce 1995) (final determination).

**11.** As requested by the court at the hearing, on October 3, 1997, within the time permitted, the government submitted a supplemental brief addressing the CEP offset issue. Delverde and Borden responded to the government's submission, filing on October 15, 1997 and October 20, 1997, respectively, also within the time indicated by the court. On November 17, 1997, the government filed a Motion for Leave to File an attached reply to Borden's response, as per US-CIT Rules 6 and 71. On December 2, 1997, Borden opposed the government's Motion and filed its own Motion for Leave to File a surreply to the government's reply, in the event that the court should grant the government's Motion. The late filing of the government's reply has

verde, requesting information concerning their sales in Italy and the United States from May 1, 1994 through April 30, 1995, and asking the amount, if any, claimed by each responding exporter for the "level of trade" adjustment to normal value authorized by 19 U.S.C. § 1677b(a)(7)(B), along with a statement justifying the claimed amount. *Antidumping Questionnaire* (July 10, 1995), at B–19, P.R. Doc. 66; Pl. Delverde's App., at A–44. Commerce also asked respondents to report the amount, if any, claimed for the constructed export price offset ("CEP offset") adjustment to normal value authorized by 19 U.S.C. § 1677b(a)(7)(B). *Id.*

Delverde responded that it claimed a LOT adjustment in the form of a CEP offset pursuant to 19 U.S.C. § 1677b(a)(7)(B), maintaining that it could not quantify price differences attributable to sales at different levels of trade in the Italian home market. *Delverde's Questionnaire Response* (Sept. 18, 1995), at 18–19, 30–31, P.R. Doc. 273, Def.-Int. Borden's App. Tab 14, Pl. Delverde's App., at A–45–48.

In a letter to all Italian respondents, Commerce asked four questions regarding the requested LOT adjustments and CEP offset. *Supplemental Antidumping Questionnaire* (Oct. 23, 1995), at 2, P.R. Doc. 359, Pl. Delverde's App., at A–51. Delverde responded only to the fourth question, maintaining that the first three questions pertained only to those requesting LOT adjustments, thus not to Delverde.[12] *Letter from Delverde to Commerce* (Nov. 6, 1995), at 3, P.R. Doc. 432, Pl. Delverde's App., at A–53, A–55. Delverde explained its inability to quantify price differences by LOT was due to the very small portion of home market sales made at an ex-

factory LOT. *Id.* at 5–6, Pl. Delverde's App., at A–57–58.

In its *Preliminary Determination,* Commerce denied Delverde's requested CEP offset, explaining that "U.S. sales were matched to normal values at the same levels of trade." 61 Fed.Reg. at 1,347. Nonetheless, Delverde was found to have a *de minimis* dumping margin of .06%. *Id.* at 1,351. Upon solicitation of its views, *Letter from Commerce to Delverde* (Jan. 22, 1996), P.R. Doc. 583, Pl. Delverde's App., at A–65, Delverde notified Commerce of its objection to the methodology used in the Preliminary Determination. *Letter from Delverde to Commerce* (Feb. 5, 1996), at 2–4, P.R. Doc. 636, Pl. Delverde's App., at A–67, A–68–70.

Commerce used a different LOT methodology in the Final Determination, one that considered Delverde's CEP sales to include some selling functions. *Final Determination,* 61 Fed.Reg. at 30,331, 30,339. On the basis of this analysis, Commerce still concluded that Delverde's U.S. sales and home market sales were made at the same LOT and, again did not grant Delverde's requested CEP offset.[13] *Id.* at 30,354.

Delverde argues that Commerce erred in concluding that Delverde's CEP sales in the United States were made at the same LOT as sales in Italy, Delverde's home market. Delverde contends that Commerce erroneously attributed selling expenses to Delverde's CEP LOT, expenses which had been excluded previously during the calculation of CEP. The government requests a remand to correct errors in its attribution of selling functions to Delverde's CEP sales for LOT analysis purposes and to reconsider whether Delverde's CEP sales can be matched to home market sales at the same LOT. It also

---

inconvenienced the court and the other parties. This is, however, an issue of statutory interpretation which may have precedential import. Thus, it is in the interest of the court to hear all the parties' arguments expressed as thoroughly and clearly as possible. Both the government's reply and Borden's surreply are allowed.

**12.** Delverde should have answered all of Commerce's questions, given that the CEP offset is a variation on the LOT adjustment, one which requires Commerce to proceed with the same LOT analysis until the last step. Borden does not

appear to be correct, however, in its contention that Delverde's alleged lack of cooperation contributed to Commerce's decision to deny the offset.

**13.** On the basis of our analysis of its selling functions we conclude that Delverde's U.S. sales and home market sales are made at the same level of trade.... Accordingly, we did not grant Delverde's request for a CEP offset in our final determination.

*Id.,* 61 Fed.Reg. at 30,354.

seeks to reconsider certain adjustments to CEP itself. The parties dispute neither the *de minimis* volume of ex-factory sales in the home market, nor the difficulty of determining the price effects of different levels of trade in the home market due to the lack of ex-factory sales. Delverde supports remand without a CEP recalculation. Borden opposes remand.

## Discussion

### 1. Level of Trade Statute

Not all differences between export prices and home market prices are the result of dumping. Therefore, Commerce adjusts the prices it compares to tease out other factors, in part through the level of trade adjustment inquiry. *See* 19 U.S.C. § 1677b(a)(7)(A).

A "level of trade" adjustment to normal value is appropriate when U.S. prices and normal value are compared at different levels of trade, if the different levels of trade involve different selling functions, and price

**14.** 19 U.S.C. § 1677b(a)(7) provides, in relevant part:

(A) Level of Trade
[Normal Value] shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and [Normal Value] (other than a difference for which allowance is *otherwise made under this section*) *that is shown* to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade—
(i) involves the performance of different selling activities; and
(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade *in the country in which normal value is* determined.
. . .
(B) Constructed export price offset
When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 1677a(d)(1)(D) of this title.

**15.** Appropriate common adjustments may include increases to account for packing costs,

differences attributable to the different levels of trade can be documented. 19 U.S.C. § 1677b(a)(7)(A). In the case of CEP sales, when normal value is determined to be at a more advanced LOT (by stage of distribution) than CEP, but the price effect of the differences in LOT in the home market cannot be determined, a "CEP offset" adjustment is authorized in lieu of a LOT adjustment. 19 U.S.C. § 1677b(a)(7)(B).[14]

### 2. Commerce's Level of Trade Methodology

Commerce makes certain additions and deductions in calculating normal value, 19 U.S.C. § 1677b(a)(6), and export price or constructed export price, 19 U.S.C. §§ 1677a(c)–(d) (1994). These adjustments are divided into those common to export price and CEP,[15] at 19 U.S.C. § 1677a(c), and those specific to CEP[16] only, at 19 U.S.C. § 1677a(d).[17] The 19 U.S.C. § 1677a(d) de-

duty drawback, and countervailing duties to offset export subsidies and/or reductions to account for movement costs, U.S. import duties and any export taxes or other charges imposed on the exportation of the merchandise. 19 U.S.C. § 1677a(c).

**16.** Constructed export price is defined as,

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d) of this section.
19 U.S.C. § 1677a(b) (1994).

**17.** These are:

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—
(A) commissions for selling the subject merchandise in the United States;
(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
(C) any selling expenses that the seller pays on behalf of the purchaser; and
(D) any selling expenses not deducted under subparagraph (A), (B), or (C);

ductions are those associated with the transaction between the affiliated importer and the first unaffiliated purchaser. *See* 19 U.S.C. §§ 1677a(b), (d).

In the LTFV analysis, Commerce must compare prices that are at the same LOT by adjusting normal value accordingly where sales are at different levels of trade. 19 U.S.C. § 1677b(a)(7). Thus, where Commerce deems sales in the foreign market and sales in the U.S. to have been made at different levels of trade, the statute provides for an additional, LOT adjustment to normal value, 19 U.S.C. § 1677b(a)(7)(A), or for a CEP offset, in the case of a comparison involving CEP sales where normal value is at a more advanced LOT but data about the relationship between LOT and price is inadequate to determine the size of a LOT adjustment, 19 U.S.C. § 1677b(a)(7)(B). Commerce interprets the mandate generally to mean it must examine levels of trade, determining where an adjustment is appropriate through a comparison of the selling functions attributable to the respective sales, the expenses for which are reflected in the starting prices. New 19 C.F.R. § 351.412 provides that where the LOT comparison is between normal value sales and export price sales, *i.e.* where the first sale in the United States is to an unaffiliated party, for its LOT inquiry, Commerce compares the normal value starting price (*i.e.* unadjusted price) with the starting export price. *Final Rule,* 62 Fed. Reg. at 27,414.

In cases involving CEP sales, Commerce tries to approximate the LOT comparison made in export price cases. In cases involving CEP sales, Commerce has, thus, developed the following level of trade methodology. *See* Def.'s Br. at 69–72. First,

beginning with the U.S. starting price used for the constructed export price calculation, Commerce adjusts that price to account for selling expenses in the U.S., making the deductions provided for in 19 U.S.C. § 1677a(d).[18] *Id.* at 69. Commerce then examines the result to determine its LOT, based on the selling expenses remaining therein. *Id.* at 70–71.

Next, Commerce determines whether the LOT of the CEP sale is matched by sales at a comparable LOT in the home market. To that end, Commerce examines unadjusted home market (normal value) sales to determine levels of trade. *Id.* at 71. Because the 19 U.S.C. § 1677a(c) adjustments are of the type that normally apply to all sales,[19] and are not made prior to comparison in the export price cases, Commerce *does not* make "(c)" adjustments to either price before the final LOT comparison. Because the § 1677a(d) adjustments allegedly will be made to the constructed export price only, 19 U.S.C. § 1677a(d), Commerce *does* make the "(d)" adjustments prior to the comparison, in an effort to approximate an export price starting price.[20]

If there are no sales in the home market at the same LOT as the "(d)" adjusted CEP sales, Commerce considers making a LOT adjustment, which is an adjustment to normal value intended to offset the price effect of the difference in LOT in the two markets. Def.'s Br. at 71. Commerce determines that levels of trade differ only when sales involve different selling functions and are associated with a consistent pattern of price differences. *Id.* If home market price data is available but reveals no consistent pattern of price differences, Commerce makes no LOT adjustment.

(2) the cost of any further manufacture or assembly (including additional material and labor) ...; and
(3) the profit allocated to the expenses described in paragraphs (1) and (2).
19 U.S.C. § 1677a(d).

**18.** There is some debate as to whether making these deductions actually simulates export price, that is, the "(d)" type deductions may include items that are also in export price.

**19.** *See* 19 U.S.C. § 1677b(a)(6) adjustments to normal value.

**20.** Defendant explains that,

the adjustments Commerce makes to the CEP starting price pursuant to section 1677a(d) typically change the level of trade. By deducting the section 1677a(d) expenses prior to performing the level of trade analysis, Commerce is making it possible to identify the same level of trade for comparable EP and CEP transactions.

Def.'s Post–Hearing Submission, at 5.

*Id.* at 72. Where the data is inadequate to make a determination regarding the pattern of prices, Commerce makes a CEP offset, pursuant to 19 U.S.C. § 1677b(a)(7)(B). *Id.*

Commerce applied the latter methodology in this case. *Final Determination,* 61 Fed. Reg. at 30,339 ("[F]or CEP sales, we considered the selling functions reflected in the price after the deduction of expenses ... under [19 U.S.C. § 1677a(d) ]"). Making § 1677a(d) deductions prior to the level of trade comparison is Commerce's established methodology. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts thereof from France, Germany, Italy, Japan, Singapore and the United Kingdom,* 62 Fed. Reg. 2,081, 2,107 (Dep't Commerce 1997).[21] Commerce's new regulations also embody this practice. New § 351.412(c)(1)(ii) provides that in the case of CEP sales, Commerce will identify levels of trade based on "the starting price, as adjusted under [19 U.S.C. § 1677a(d) ]." *Final Rule,* 62 Fed. Reg. at 27,414.

### 3. Delverde's Position

In its Motion, Delverde argued that Commerce erroneously concluded that Delverde's CEP was not a price devoid of selling functions, but rather retained the following three selling functions: price lists and/or contracts; inventory services, and freight and/or delivery. At oral argument, defendant conceded that expenses for the three selling functions were deducted from the CEP starting price under 19 U.S.C. § 1677a(d), and were not 19 U.S.C. § 1677a(c) expenses, as Commerce

had mistakenly presumed when assessing CEP level of trade.[22]

Delverde argues that CEP is defined as a "price" at a specific LOT (ex-factory), devoid of all selling expenses, U.S. or otherwise, because the statute requires the construction of CEP without any movement costs, commissions, direct selling expenses, costs paid by the seller on behalf of the buyer, or any indirect selling expenses (defined as any expenses not already deducted from the U.S. selling price). 19 U.S.C. §§ 1677a(b)–(d). Delverde therefore believes that Commerce, prior to making the LOT comparison, should make both § 1677a(c) and § 1677a(d) adjustments.[23] According to Delverde, Commerce would then view the LOT of CEP as ex-factory. The fact that only *de minimis* sales without any selling expenses exist in the home market makes it self-evident to Delverde that its CEP sales had no LOT counterparts, no LOT adjustment could have been quantified, and the LOT of its normal value sales was at a more advanced stage of distribution than that of its CEP sales. Thus, it ostensibly meets the three requirements for granting a CEP offset adjustment, pursuant to 19 U.S.C. § 1677b(a)(7)(B). Commerce allegedly erred in failing to recognize this, attributed selling expenses to Delverde's CEP, and engaged in an "apples to oranges" comparison, resulting in a positive, significant dumping margin. Accordingly, Delverde maintains that Commerce's failure to grant its CEP offset request contravened the "fairness" provision of the statute, 19

---

**21.** This is not Commerce's first opportunity to articulate its methodology. Commerce explained itself in *Antifriction Bearings.*

> The statutory definition of "constructed export price" ... indicates clearly that we are to base CEP on the U.S. resale price as adjusted for U.S. selling expenses and profit. As such, the CEP reflects a price exclusive of all selling expenses and profit associated with economic activities occurring in the United States. These adjustments are necessary in order to arrive at, as the term CEP makes clear, a "constructed" export price. The adjustments we make to the starting price, specifically those made pursuant to [19 U.S.C. § 1677a(d) ] ... normally change the level of trade. Accordingly, we must determine the level of trade of CEP sales exclusive of the expenses (and

concomitant selling functions) that we deduct pursuant to this sub-section.
*Id.* (citation omitted).

**22.** The error may have been due to the term "freight and/or delivery" which suggests "(c)" movement costs and not the arranging of transportation of goods by the producer or agent under "(d)".

**23.** Delverde agrees with defendant that Commerce is right to deduct from CEP before the comparison, but maintains that Commerce should have deducted both § 1677a(c) and § 1677a(d) expenses. For the purpose of the instant inquiry, on these specific facts, however, Delverde is willing to accept deduction of only the § 1677a(d) expenses and therefore supports Commerce's remand request.

U.S.C. § 1677b(a), and the GATT, Art. 2.4, Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, *in Final Text of the GATT Uruguay Round Agreements* (Apr. 15, 1994) ["Antidumping Code"].[24]

### 4. Borden's Position[25]

Borden opposes defendant's remand request, arguing that Commerce seeks a remand to perpetuate an unfair, skewed comparison between an adjusted CEP and an unadjusted normal value. Borden denies the import of the distinction Commerce draws between 19 U.S.C. § 1677a(c) and (d) deductions. Borden contends that most selling expenses excluded from CEP before the LOT comparison will subsequently be deducted from normal value. Thus, Borden argues that the comparison is faulty if made after deducting the expenses from one side but before the deduction from the other.

Borden maintains that Delverde has failed to distinguish selling expenses from selling functions, that Delverde's contention is incorrect that all CEP sales have an ex-factory LOT, even though all selling expenses are deducted from CEP during the price calculation. In Borden's view, the inquiry does not ask whether the price to be compared "contains" selling functions but rather whether the sales are at the same or different levels of trade, as defined by the selling functions they embody. CEP, by definition, does not embody any selling expenses, but that im-plies nothing about the LOT of the underlying sales. Adjustments to the CEP starting price might render a price with no selling expenses, for example, but that may be an adjusted wholesale price or an adjusted retail price. The LOT inquiry thus concerns the LOT of the sales, not of the price. Thus, in Borden's view, the LOT of the CEP sales does not exclude selling expenses, even though selling expenses are deducted in calculating CEP. Borden therefore contends that, while CEP itself excludes selling expenses, in determining the propriety of LOT adjustments or CEP offsets, Commerce correctly examined the selling functions of Delverde's CEP sales.

### 5. Defendant's Position

After oral argument and rebriefing, Commerce reiterated its request for a remand to revise its LOT analysis by correcting its previous miscategorization of selling expenses deducted under 19 U.S.C. § 1677a(d) during the constructed export price calculation as having been deducted under subsection 1677a(c). Commerce would then reevaluate its LOT adjustment and CEP offset decisions in light of any remaining selling expenses.[26]

As indicated, Commerce bases its decision to adjust the CEP starting price in two statutory provisions: 19 U.S.C. § 1677b(a)(1)(B)(i), which instructs Commerce to calculate normal value "to the extent practicable, at the same level of trade as

---

24. To make a fair comparison CEP sales and home market sales must be compared at the same LOT. Article 2.4 of the Antidumping Code states, in relevant part:

> (2.4) A *fair comparison shall be made between the export price and the normal value. This comparison shall be made at the same level of trade, normally at the ex-factory level ....* Due allowance shall be made in each case, on its merits, for differences which affect price comparability, including ... *levels of trade ...* which are ... demonstrated to affect price comparability.... If in these cases price comparability has been affected, the authorities shall establish the normal value at a level of trade equivalent to the level of trade of the constructed export price....

*Id.* (emphasis supplied). Although the court does not apply GATT, Delverde appeals to the provisions of the Antidumping Agreement when inter-preting U.S. law, because the URAA is meant to conform U.S. antidumping law to the GATT.

25. Borden portrays Commerce's denial of Delverde's requested CEP offset as a variant of a "Facts Available" determination, pursuant to 19 U.S.C. § 1677e (1994), or as an appropriate punishment for Delverde's alleged willful refusal to cooperate during the LOT inquiry. This view is inconsistent both with Commerce's stated reason for denying Delverde's CEP offset, that it found no difference in LOT between U.S. and Italian sales, *Final Determination*, 61 Fed.Reg. at 30,-354, and with Commerce's request for a remand to correct errors made in applying its CEP LOT methodology.

26. Whether Commerce might also, as suggested in defendant's post-hearing submissions, reconsider the calculation of CEP itself on remand is discussed *infra*.

the ... constructed export price," and 19 U.S.C. § 1677a(b), which defines "constructed export price" as the affiliate's price in the United States "as adjusted under subsections (c) and (d)." [27] Commerce finds further justification in the SAA for beginning the LOT inquiry with a partially adjusted CEP. SAA at 823. The SAA describes the purpose of the deductions made in the CEP price calculation as converting the affiliate's price into, "as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers." *Id.*

Defendant rejects Borden's suggestion that Commerce compare levels of trade by evaluating the selling functions in both unadjusted CEP and unadjusted normal value sales. Defendant argues that to do so would mean that the CEP deductions,

> *cannot* create a difference in level of trade between the CEP sales and the originally comparable home market sales. And, without a difference in level of trade, there can be no level of trade deduction and no CEP offset from normal value to account for the disparity created by the CEP deductions.

Def.'s Post–Hearing Reply, at 4. As defendant understands the inquiry, Commerce's methodology, rather than creating an automatic adjustment, preserves the *possibility* of any adjustment at all.

> As interpreted by Borden, the new statutory framework ... precludes any adjustment to normal value that will compensate for the difference in level of trade created by the CEP deductions.

*Id.* In other words, defendant asserts that deductions specific to CEP starting price intended to correct for the sale to an affiliate, because they are deductions of selling expenses, will change the level of trade of CEP. Moreover, if these are made after the LOT inquiry, there will not be a corresponding LOT adjustment to normal value to counterbalance that deduction. Commerce is concerned that the § 1677a(d) deductions will shift only one side of the balance, requiring a counterbalancing adjustment, and that the LOT adjustment is meant to address that, but cannot if the inquiry is completed before the § 1677a(d) deductions. Thus, to Commerce, failure to make the § 1677a(d) adjustments creates the distortion, not the reverse.

### 6. The Level of Trade Provision is a Conditional Mandate

The methodology applied in this case, *Final Determination,* 61 Fed.Reg. at 30,339, and recently promulgated in its rules, *Final Rule,* 62 Fed.Reg. at 27,414, derives from Commerce's interpretation of 19 U.S.C. § 1677b(a)(7). The Supreme Court in *Chevron* outlined a two-step inquiry to determine when a court should defer to an agency's statutory interpretation. 467 U.S. at 842, 104 S.Ct. 2778. First the court determines whether the statute is silent or ambiguous. *Id.* at 842–43, 104 S.Ct. 2778. If the statute is clear, the court does not defer to the agency's interpretation; only if the statute is silent or not clear as to the issue at bar does the court proceed to the second step and ask if the agency's interpretation is reasonable. *Id.* at 843, 104 S.Ct. 2778. The court does not find statutory silence or ambiguity as to the fundamental matters at issue in this case.

Whatever are Commerce's concerns about a balanced final price comparison, Congress has defined how this particular adjustment will be made. The statute clearly provides for a *conditional* level of trade adjustment, instructing Commerce to make the adjustment to normal value if various conditions obtains. 19 U.S.C. § 1677b(a)(7). By contrast, the methodology employed by Commerce amounts to an unconditional adjustment in every CEP case.[28] This is clear both in Commerce's actual practice and in defendant's explanation and defense of that practice, as set forth *supra.*

---

27. This provision is not supportive of Defendant's position because Commerce does not make all adjustments before the comparison, but rather only subsection (d) adjustments.

28. Missing the point that the pre-adjustment itself creates the automatic CEP offset, the defendant counters this claim by citing instances in which Commerce rejected claimed CEP offsets or made LOT adjustments instead. Those cases are not persuasive, because those offsets or adjustments amount to *additional* offsets or adjustments under Commerce's current methodology.

Commerce's argument is built both on a misreading of the statute and on the notion that normal value is ultimately unadjusted for "(d)" type expenses. That is, of course, incorrect. Normal value is adjusted for differences in circumstances of sales ("COS"), covering various selling expenses. 19 U.S.C. § 1677b(a)(6)(C)(iii). Under former practice, which included comparison of home market price and exporter's sale price (ESP), there was no statutory adjustment to home market sales for *indirect* selling expenses. The agency created an automatic ESP offset, which adjusted home market price for indirect expenses attributable to home market sales up to the level of the like ESP deduction. *See Smith–Corona Group v. United States,* 713 F.2d 1568, 1572, 1573 (Fed.Cir. 1983); 19 C.F.R. § 353.56(b)(2) (1994). This offset does not apply to the normal value—CEP comparison. Now, if such expenses relate to selling functions at a more advanced level of trade, that will be revealed in the LOT analysis, and an adjustment may be made. Any adjustment to normal value based on LOT may not be made automatically to adjust for such indirect expenses, but may only be made pursuant to the specific requirements set forth by Congress for a LOT or CEP offset adjustment.[29] 19 U.S.C. § 1677b(a)(7).

■ The court finds that Commerce's LOT comparison methodology in CEP cases does not comport reasonably with the current statutory scheme. The statute makes no mention of "(d)" type adjustments prior to the LOT analysis. While the definition of CEP in 19 U.S.C. § 1677a(b) refers to CEP as adjusted under subsections (c) and (d), § 1677b(a)(7), providing for the LOT and CEP adjustments, makes no direct reference to any adjustment. The statute instructs Commerce to compare based on differing levels of trade of sales in the United States and in the foreign market. 19 U.S.C. § 1677b(a)(7). The statute is *not* silent as to how Commerce is to contend with differences

in the selling functions of these two types of sales. *Id.* Indeed, the statutory provision for LOT adjustments and CEP offsets themselves accomplish what Commerce purports to do by its particular choice of pre-adjustment in CEP cases. *Id.* The difference is that Commerce makes the adjustment automatically, while Congress set prerequisites for the adjustment.

Commerce's limited adjustment to price before the LOT analysis contravenes the purpose of the statute. The statute leaves no room for Commerce's ostensible discretion to pre-adjust for selling expenses in the United States through the automatic deduction of § 1677a(d) selling expenses prior to the LOT analysis in all CEP cases.

While 19 U.S.C. § 1677b(a)(7) does not state expressly that the "sales" underlying the *prices* at issue be analyzed, it is only sales which are at a level of trade and involve selling functions. The statute directs Commerce to first determine what selling activities are involved in demonstrably different levels of trade. 19 U.S.C. § 1677b(a)(7)(A)(i). Then it directs that patterns of normal value "sales" at different levels of trade be analyzed. 19 U.S.C. § 1677b(a)(7)(A)(ii). The natural reading of the statute is that the sales be examined and that other adjustments to price be considered separately. If this cannot be done, Commerce must devise some method other than its current practice, which is inconsistent with 19 U.S.C. § 1677b(a)(7). The method suggested by Delverde is equally distorted. Fully adjusting CEP sales prices has the apparent advantage of at least matching the definition of CEP set forth for price comparison purposes, but doing so creates another automatic CEP offset based on the comparison of a fully adjusted CEP with an unadjusted normal value price. Commerce must focus on differences in selling functions which relate to levels of trade and make the LOT and CEP adjustments only when the statutory conditions are met.

---

**29.** The court does not reach the issue of what is covered by a COS adjustment under the new statute, although 19 C.F.R. § 351.410 states that it covers, except for commissions, only direct and assumed selling expenses. Nor does the court resolve the broader issue of whether all indirect expenses are accounted for elsewhere. If Congress' specific words have created what may seem to be an imbalance in final price comparisons, only Congress can rectify the problem. Neither the court nor Commerce may rewrite the statute.

### 7. Commerce May Not Recalculate CEP on Remand

The court turns to the question of whether Commerce may reconsider the actual CEP calculation on remand, as opposed to the separate evaluation of the level of trade of CEP sales discussed above, even though no adversary challenged the CEP calculation in this action. After the hearing, the parties were asked to rebrief the issue of Commerce's correct LOT methodology. In its post-hearing submission, Commerce requested a remand not only to reconsider the categorization of expenses as having been made under 19 U.S.C. § 1677a(c) or (d) during the CEP price calculation, but also to revisit the calculation of the constructed export price itself through a reexamination of the § 1677a(d) deductions made to determine whether they did properly relate to selling expenses in the United States.[30]

Delverde and Borden both strongly oppose defendant's suggestion that on remand Commerce might recalculate CEP price. They argue that Commerce cannot revise the CEP calculation on remand, given that no party has challenged it, adding that the calculation was *already* reconsidered between Commerce's Preliminary and Final Determinations. *Final Determination*, 61 Fed.Reg. at 30,352. Delverde therefore requests a remand to Commerce which specifically prohibits recalculation of CEP, and Borden continues to oppose any remand whatsoever.

 Except as the statutory scheme specifically so provides, an agency may not, *sua sponte*, re-open an investigation for which it has made and publicized a final determination, disturbing the finality of its own decision. An agency cannot disturb the finality of its determinations, *Badger–Powhatan v. United States*, 10 C.I.T. 241, 245, 633 F.Supp. 1364, 1369 (1986), except where a mistake has been shown, *American Trucking Ass'n v. Frisco Transportation Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958). Here, neither the opposing parties nor the government made any specific representation that Commerce erred in its original CEP calculation; Commerce merely seeks an additional review of the calculation made with an opportunity to rethink and revise. On remand, Commerce may not revisit the question of the CEP calculation.

The court therefore remands to Commerce to apply a level of trade methodology in conformity with the statute governing this case. Commerce's new methodology should incorporate certain guiding principles. The aim of the LOT inquiry must be to assist in making a fair comparison between home market and U.S. pricing. The steps of the inquiry should be analytically-based and not merely map the methods used in export price cases. The outcome must be conditioned on the terms of the statute. The inquiry must concern all types of selling functions related to levels of trade, not simply those functions' associated with deductible selling expenses. Thus, the LOT inquiry must be analytically distinct from the price calculation itself. In applying the new methodology to this case, the court specifically instructs Commerce not to recalculate CEP.

### III. De Cecco's Margin Established by Total Facts Available.

#### Facts

On October 25, 1995, Commerce initiated a cost of production investigation of De Cecco with regard to the establishment of normal value. *Initiation of Cost Investigation* (Oct. 25, 1995), at 1, P.R. Doc. 383, Pl. De Cecco's App. Vol. I, Tab 10. The original questionnaire response deadline was November 8, 1995. *Id.* De Cecco requested an extension of time to respond because it was involved in two other investigations; because it had "no formal cost accounting system that tracks costs as required by the Department," translation requirements, and a very large data set; and because its computer materials were incompatible with Commerce's requests. *Letter from De Cecco to Commerce* (Oct. 27, 1995), at 1–2, P.R. Doc. 407, Pl. De Cecco's App. Vol. I, Tab 11; *Letter from De Cecco to*

---

**30.** If it is true that an erroneous view of "(d)" deductions has skewed Commerce's view of LOT analysis, it may not rely on that as a reason to bend the LOT statute. If something is amiss with Commerce's definition of "(d)" adjustments it may attend to that in future cases or where a challenge to the "(d)" adjustment is made.

*Commerce* (Oct. 30, 1995), at 1–2, P.R. Doc. 413, Pl. De Cecco's App. Vol. I, Tab 12. An extension until November 16, 1995 was granted for De Cecco to respond to Section D of Commerce's supplemental questionnaire. *Letter from Commerce to De Cecco* (Oct. 31, 1995), at 1, P.R. 417, Pl. De Cecco's App. Vol. I, Tab 13.

On November 6, 1995, in a response to Sections A, B, and C of Commerce's supplemental questionnaire, De Cecco also stated that it "does not have a 'cost accounting system' separate from its financial accounts and does not develop fully absorbed product costs, product by product, in the normal course of business." *De Cecco's Response to Supp. Quest. §§ A, B, and C* (Nov. 6, 1995), at 42, P.R. Doc. 437, Pl. De Cecco's App. Vol. I, Tab 14.

On November 13, 1995, De Cecco asked for another extension, citing its "small staff." *Letter from De Cecco to Commerce* (Nov. 13, 1995), at 4, P.R. 454, Pl.'s App. Vol. I, Tab 15. The request was denied, and De Cecco filed its cost questionnaire response on November 27, 1995, stating that "De Cecco has developed standard yields and process times as a basis for a standard cost system." *De Cecco's Response to Supp. Quest. § D* (Nov. 27, 1995), at D–23, C.R. 172, Pl.'s App. Vol. II, Tab 43, at D–23. De Cecco used these yields and process times "to develop the model-specific costs reported for COP and CV." *Id.* Further, "costs were accumulated based on these standards, then adjusted to actual costs. The full product detail from the standards was used to allocate costs to product." *Id.*

Because of the complexity of the investigation, both the Preliminary and Final Determinations were delayed. *See Letter from De Cecco to Commerce* (Jan. 31, 1996), at 2–3, P.R. Doc. 619, Pl.'s App. Vol. I, Tab 24, at 2–3. In the *Preliminary Determination,* De Cecco received a facts available margin of 46.67%, based on an average of the margins stated in the notice of initiation, which were based on petition information. 61 Fed.Reg. at 1,345. This resulted from, among other things, De Cecco's incomplete questionnaire response regarding affiliates, *id.,* specifically its late identification of a company, De Cecco

Moline de Pastificio Pescara ("Pescara"), which has family owners in common with De Cecco, Pl. De Cecco's Br. at 6.

After the Preliminary Determination, Commerce issued a deficiency questionnaire, seeking information about the cost methodology used in De Cecco's Dec. 6, 1995, submission. *Letter from Commerce to De Cecco* (Jan. 11, 1996), at 1, C.R. Doc. 222, Pl. De Cecco's App. Vol. II, Tab 47, at 1. De Cecco still owed Commerce a reconciliation of total costs to financial statements and computer cost data which included Pescara. *Id.*

After hiring new consultants to generate better cost data, De Cecco was unable to meet the February 2, 1996, deadline for its corrections to its home market sales computer tape. *Letter from De Cecco to Commerce* (Jan. 31, 1996), at 1–2, P.R. Doc. 619, Pl. De Cecco's App. Vol. I, Tab 24, at 1–2. De Cecco received permission to file its computer data on February 6, 1996, *Letter from Commerce to De Cecco* (Feb. 1, 1996), at 1, P.R. Doc. 622, Pl. De Cecco's App. Vol. I, Tab 25, but its narrative was still due on February 2, 1996. *Letter from De Cecco to Commerce* (Jan. 11, 1996), C.R. Doc. 222, Pl. De Cecco's App. Vol. II, Tab 47. The narrative response, which was timely filed, *De Cecco's Resp. to Supp. Quest.* (Feb. 2, 1996), at 1, C.R. Doc. 237, Pl. De Cecco's App. Vol. IV, 1, did not respond directly to Commerce's deficiency questions, because it contained a new approach to costing, which De Cecco stated was more consistent with actual experience than the costs based on "production standards." *Id.* at Ex. SC–2, at 1; Pl. De Cecco's Br. at 17.

When submitting its computer tapes on February 6, De Cecco also sent corrections to its February 2 narrative. *Letter from De Cecco to Commerce* (Feb. 6, 1996), C.R. Doc. 251, Pl. De Cecco's App. Vol. III, Tab 48. De Cecco attempted to make further corrections on February 7. *See* Commerce's Mem. to File (Feb. 16, 1996), at 3, P.R. Doc. 695, Pl. De Cecco's App. Vol. I, Tab 32.

On February 8, petitioners asked Commerce to cancel De Cecco's verification. *Letter from De Cecco to Commerce* (Feb. 8, 1996), at 1, P.R. Doc. 660, Pl. De Cecco's

## 1244

App. Vol. I, Tab 27. Commerce met with De Cecco's counsel on February 9 and posed questions about De Cecco's changed data. De Cecco timely responded that same day and included further corrections to its data. *De Cecco's Resp. to Supp. Quest.* (Feb. 9, 1996), C.R. Doc. 263, Pl. De Cecco's App. Vol. III, Tab 49. De Cecco continued to seek a postponement for submission of its reconciliation statement. *See Letter from De Cecco to Commerce* (Feb. 12, 1996), C.R. Doc. 270, Pl. De Cecco's App. Vol. III, Tab 50. The reconciliation was finally filed on February 13, 1996. *See Final Determination,* 61 Fed. Reg. at 30,327.

A February 16, 1996, memorandum from Commerce's Office of Accounting, *Commerce's Mem. to File* (Feb. 16, 1996), at 3, P.R. Doc. 695, Pl. De Cecco's App. Vol. I, Tab 32, noted basically the same deficiencies in the February 2, 1996, data as were noted by petitioner in its February 8, 1996 request to cancel verification. *Letter from Borden to Commerce* (Feb. 8, 1996), P.R. 660, Pl. De Cecco's App. Vol. I, Tab 27. Commerce seemed unprepared to deal with De Cecco's corrections and change in cost data. Because Commerce found the data submitted to be both late and untrustworthy, and verification was scheduled for February 19, 1996, Commerce decided to resort to total facts available. *See Commerce Mem. to File* (Feb. 15, 1996), P.R. Doc. 686, Pl. De Cecco's App. Vol. I, Tab 30. The 46.67% facts available margin from the *Preliminary Determination,* 61 Fed.Reg. at 1,345, was adopted in the *Final Determination.* 61 Fed.Reg. at 30,329.

### Discussion

What is clear from this brief summary of the facts is that De Cecco did not submit all of the information requested by Commerce in a timely manner. Under prior law, this might have been sufficient for Commerce to immediately cancel verification and switch to surrogate information. This is no longer the case. Under current law, Commerce must make a series of determinations.

In 1994, 19 U.S.C. § 1677e(a) (1988), was amended by the URAA, Pub.L. 103–465, § 231(c) (1994), to conform to the requirements of Article 6.8 and Annex II of the Agreement on Implementation of Article VI of the GATT 1994 ("AD Agreement"). 19 U.S.C. § 1677e(a) (1994); Article 6.8 and Annex II, Best Information Available in Terms of Paragraph 8 of Article 6, in *Final Text of the GATT Uruguay Round Agreements* (Apr. 15, 1994), at 154, 168 ["GATT Annex II"]. The statute now provides as follows:

(a) **In general.** If –

(1) necessary information is not available on the record, or

(2) an interested party or any other person –

(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of [19 U.S.C. § 1677m],

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in [19 U.S.C. § 1677m(i) ],

the administering authority and the Commission shall, subject to [19 U.S.C. § 1677m(d) ], use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a) (1994).

Thus, the statute, as amended, mandates that the Department "shall" use facts available where necessary information is not available, 19 U.S.C. § 1677e(a)(1), or in any of four other instances described in 19 U.S.C. §§ 1677e(a)(2)(A)–(D). Those four instances are where (A) a party withholds information, (B) a party fails to provide information within the time or in the form and manner requested, (C) the party significantly impedes the investigation, or (D) the information cannot be verified. Subsection § 1677e(a) provides that in every instance the use of facts available shall be subject to 19 U.S.C. § 1677m(d) (1994). 19 U.S.C. § 1677e(a). It also provides, in the case of a failure to provide information within the time or in the form or manner requested under 19 U.S.C.

§ 1677e(a)(2)(B), that the use of facts available shall also be subject to 19 U.S.C. § 1677m(e) (1994). 19 U.S.C. § 1677e(a).

In this case, the Department relied on 19 U.S.C. § 1677e(c)(2)(B), failure to provide information within the time or in the form and manner requested.[31] Thus, this was not a case in which Commerce determined that the basis for utilization of facts available is that De Cecco "withheld information," 19 U.S.C. § 1677e(a)(2)(A), or "impeded" the investigation, 19 U.S.C. § 1677e(a)(2)(C), or in which information "cannot be verified," 19 U.S.C. § 1677e(a)(2)(D). Because the Department's determination was based on 19 U.S.C. § 1677e(a)(2)(B), its decision whether to use facts available was subject to 19 U.S.C. §§ 1677m(d) and (e).

Under the new statutory scheme, 19 U.S.C. § 1677m is designed to prevent the unrestrained use of facts available as to a firm which makes its best effort to cooperate with the Department. This section was enacted, as part of the URAA, Pub.L. 103–465 § 231, to implement portions of Annex II to the AD Agreement, which provides, in part, that information which "may not be ideal" should not be disregarded if the party "has acted to the best of its ability." GATT Annex II, section 5, at 168.

The key provisions of 19 U.S.C. § 1677m for this case are subsection (d), regarding "deficient submissions," and subsection (e), regarding "use of certain information." Subsection (d) reads as follows:

**(d) Deficient submissions.** If the [Department] ... determines that a response to a request for information under this subtitle does not comply with the request, the [Department] ... shall promptly inform the person submitting the response of the nature of the deficiency and *shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.* If

that person submits further information in response to such deficiency and either –

(1) the [Department] ... finds that such response is *not satisfactory,* or

(2) such response is not submitted within the applicable time limits,

then the [Department] ... may, *subject to subsection (e) of this section,* disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d) (emphasis supplied). Subsection (d) thus requires that a party be given an opportunity to remedy or explain deficient submissions. *Id.* If the remedy or explanation is "not satisfactory" or is untimely, the information may be disregarded, subject, however, to a five-part test contained in subsection (e). 19 U.S.C. § 1677m(e).

Subsection (e) may require use of the respondent's information notwithstanding that a remedy or explanation is unsatisfactory. *Id.* Subsection (e) reads as follows:

**(e) Use of certain information.** In reaching a determination under ... [19 U.S.C. § 1673d] the [Department] *shall not decline* to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the [Department], if –

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is *not so incomplete that it cannot serve as a reliable basis* for reaching the applicable determination,

(4) the interested party has demonstrated that it *acted to the best of its ability* in providing the information and meeting the requirements established by the [Department] with respect to the information, and

---

**31.** [T]he Department determined that De Cecco failed to provide its COP information by the deadlines established or in the form and manner requested. [19 U.S.C. § 1677e(a)] thus required the Department to use the facts available.... *Final Determination,* 61 Fed.Reg. at 30,328–29.

(5) the information can be used without undue difficulties. (emphasis supplied.)

19 U.S.C. § 1677m(e).

Thus, under subsection (e), even if the initial information submitted is "deficient", and even if, after an opportunity to "remedy or explain," the Department finds the information "not satisfactory," it *still* must use the information, rather than facts available, so long as the criteria of subsection (e) have been met. *Id.*

■ Although Commerce appears to have taken a strict approach to subsection (e), the court cannot say it unreasonably resorted to total facts available. Data was submitted late. *Final Determination,* 61 Fed.Reg. at 30,327. Commerce had genuine concerns about the lack of complete data, particularly the reconciliation statement, and genuine fears that it could not prepare for a thorough verification because of the continual changes to De Cecco's data. *Id.* Thus, at this stage, the court does not reach the issue of whether De Cecco supplied information "to the best of its ability" or whether its data was reliable. The court does find that Commerce was not required to conduct a verification for De Cecco. The next issue is what data could be used for De Cecco.

The court concludes that Commerce's stated concern that ranged data for other parties could not be used to establish normal value for De Cecco because of product mix is somewhat undermined by its disregard of exact product mix in other facets of the investigation. *See id.* at 30,329. Given that De Cecco had some of the highest U.S. prices,[32] and given the allegation of home market sales below cost of production, however, verification of De Cecco's home market costs was essential and use of ranged data for normal value became problematic. Thus, resort to total facts available, i.e., a substitute margin, was permissible. *Id.* at 30,328–29. Where Commerce appears to have erred is in its automatic resort to adverse information once it decided De Cecco did not comply with its requests.

■ As noted above, the Department based its determination that it must use facts available on 19 U.S.C. § 1677e(a)(2)(B), finding that "De Cecco failed to provide its COP information by the deadlines established or in the form and manner requested." *Final Determination,* 61 Fed.Reg. at 30,329. Section 1677e contains two additional provisions, subsections (b) and (c), which come into play once the determination is made that the use of facts available is required. 19 U.S.C. § 1677e. Subsection (b) permits an adverse inference if the Department can make the additional finding that the "party has failed to cooperate by not acting to the best of its ability to comply." 19 U.S.C. § 1677e(b). It reads, in part, as follow:

> **(b) Adverse inferences.** If the [Department] ... finds that an interested party has *failed to cooperate by not acting to the best of its ability* to comply with a request for information ..., [the Department,] in reaching the applicable determination under this subtitle, *may use an inference that is adverse* to the interests of that party in selecting from among the facts otherwise available.

*Id.* (emphasis supplied). Here, the Department did not make the required *additional* finding that De Cecco had failed to act to the best of its ability. *Final Determination,* 61 Fed.Reg. at 30,329. In essence, it simply repeated its 19 U.S.C. § 1677e(a)(2)(B) finding, using slightly different words:

> De Cecco's failure to provide complete and accurate information in a timely manner and its failure to clarify inconsistencies in its submissions to the record demonstrate that De Cecco has failed to cooperate to the best of its ability in this investigation.

*Id.*

Commerce seems to have leaped to the conclusion that De Cecco willingly did not comply and to have misapprehended, or not adequately considered, De Cecco's repeated statements that it *did not have a cost accounting system;* it was merely trying to develop one. *Letter from De Cecco to Commerce* (Oct. 27, 1995), at 7, P.R. Doc. 407, Pl.

---

**32.** Ranged data for normal value would include high and low prices. When compared with high U.S. prices for De Cecco, zero or low margins would naturally result, to De Cecco's benefit.

De Cecco's App. Vol. I, Tab 11; *see also Letter from De Cecco to Commerce* (Oct. 30, 1995), at 2, P.R. 413, Pl. De Cecco's App., Vol. I, Tab 12. Whether or not De Cecco should have tried to completely change its cost methodology after it discovered problems with its first approach is a question of judgment. Commerce and petitioners seem to suspect that De Cecco changed methods not because it contained errors, but because the first system was unfavorable to it. Commerce, however, never made that finding. It stated De Cecco did not timely explain changes that were favorable to it and in the end, it simply found De Cecco did not comply. *Final Determination,* 61 Fed.Reg. at 30,328; *Letter from Commerce to De Cecco* (Nov. 22, 1995), at 1–2, P.R. Doc. 467, Pl. De Cecco's App. Vol. I, Tab 16.

De Cecco provided a huge volume of data which it continually had to adjust, at least partially because its cost accounting system was a work in progress and time limits were short. *Letter from De Cecco to Commerce* (Oct. 27, 1995), P.R. Doc. 407, Pl. De Cecco's App. Vol. I, Tab 11. Commerce has articulated no reason for finding De Cecco's failure was an unwillingness, rather than simply an inability, to cooperate, other than vague hints that De Cecco was "cooking the books." Commerce must revisit this issue. Given the history of De Cecco's numerous communications, explanations, and submissions to Commerce, if there is no evidence to support a finding that De Cecco could have provided all the information Commerce wanted in a timely manner, Commerce may not draw an adverse inference. In such a case, Commerce must use whatever information it has that can best provide a surrogate margin for estimated deposit purposes.

 Furthermore, the rate selected by Commerce does not appear to be a margin which is usable, whether or not an adverse inference may be drawn as to De Cecco. Petitioner's margins, while largely based on public data, have not been shown to be reli-

able. Commerce determined in the period between the Preliminary Determination and Final Determination that the petition margins were high for all parties whose data was verified. Commerce cannot use information which has been thoroughly discredited. *Cf. D & L Supply Co. v. United States,* 113 F.3d 1220, 1221 (Fed.Cir.1997) (Under less rigorous predecessor statute, Commerce could not use margin as best information available which court had rejected). De Cecco was a high end producer. Other high end producers had very low margins, and even low end producers had margins substantially under the petition margins. *Final Determination,* 61 Fed.Reg. at 30,329–30. The *possibility* does exist that De Cecco's "true" margin may be in the very high range selected by Commerce, because that possibility cannot be eliminated without verification of De Cecco's own data. Commerce concludes from this mere possibility, that it is probable that an appropriate margin is in that range. There is simply nothing to support such an inference. Accordingly, if Commerce properly draws an adverse inference, it may use the highest verified margin of 21.34%, as, under these facts, even that margin is very likely to be adverse to De Cecco. If Commerce does not draw an adverse inference, it may apply a lower rate, including the all others' rate.

The parties also disagree as to whether petitioner's data in the petition is corroborated by independent data, as required by 19 U.S.C. § 1677e(c) (1994).[33] The court doubts that Congress intended that any generally available published data is "self-corroborating," as defendant claims. *See* Def.'s Br. at 66. The sense of the statute is that even where the petition is based on *apparently* reliable public data, if it is called into question by Commerce's investigation, as is the data here, the petition data must be corroborated by data apart from itself. 19 U.S.C. § 1677e(c). Under the facts of this case, the petition margins are not corroborated. As

---

**33.** 19 U.S.C. § 1677e(c) provides as follows:

**(c) Corroboration of secondary information** .
When the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the ad-

ministering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

there are other suitable margins available for use in this case, Commerce cannot revert to the petition information under a claim of necessity. The margin selected by Commerce is neither based on corroborated data nor supported by substantial evidence. It may not be utilized.

Commerce shall make findings as to whether De Cecco acted to the best of its ability. Following that determination, it shall draw appropriate inferences and select a margin based on facts available, either adverse or not adverse, as required by the inference drawn.

### Conclusion

For the foregoing reasons, the court remands this matter to Commerce to continue its targeted dumping inquiry either by articulating general or case-specific standards and permitting Borden to resubmit its targeting allegation pursuant to such standards, or by examining the Delverde data itself to determine whether an analysis based on transaction-specific prices is appropriate. Borden's challenge to Commerce's commission offset methodology is denied as untimely. Likewise affirmed is Commerce's depreciation calculation substituted for Delverde affiliate Tamma's own revised calculation. The court remands to Commerce to revise its level of trade methodology under 19 U.S.C. § 1677b(a)(7), consistent with this opinion, without recalculating constructed export price. Finally, Commerce is to evaluate whether De Cecco cooperated to the best of its ability, and select a new dumping margin for De Cecco.

Remand results are due within 60 days. Objections are due 20 days thereafter, responses 11 days thereafter.