Slip Op. 03 - 70

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

| | |
|---|---|
| FIRTH RIXSON SPECIAL STEELS LIMITED | : |
| Plaintiff, | : |
| v. | : **Before: MUSGRAVE, JUDGE** |
| UNITED STATES, | : Court No. 02-00273 |
| Defendant, | : |
| and | : |
| CARPENTER TECHNOLOGY CORP.; CRUCIBLE SPECIALTIES METALS DIV. CRUCIBLE METALS CORP.; ELECTROALLOY CORP.; SLATER STEELS CORP., FORT WAYNE SPECIALTY ALLOYS DIVISION; AND THE UNITED STEEL WORKERS OF AMERICA, AFL-CIO/CLC, | : |
| Defendant-Intervenors. | : |

[The plaintiff challenged antidumping investigation finding that questionnaire responses warranted adverse inference in selection of facts otherwise available; CIT Rule 56.2 motion denied, judgment for the defendant.]

Decided: June 27, 2003

*Pillsbury Winthrop LLP*, Washington DC (*Christopher R. Wall*), for the plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General; *David M. Cohen*, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*A. David Lafer*), Office of Chief Counsel for Import Administration, U.S. Department of Commerce (*James K. Lockett*), of counsel, for the defendant.

*Collier Shannon Scott, PLLC,* (*Robin H. Gilbert*), Washington, D.C., for the defendant-intervenors.

# OPINION

Plaintiff Firth Rixson Special Steels Limited ("FRSS") appeals the margin determined in an antidumping investigation conducted by the International Trade Administration of the United States Department of Commerce ("Commerce"or the "Department") and published *sub nom. Notice of Final Determination of Sale at Less Than Fair Value: Stainless Steel Bar From the United Kingdom*, 67 Fed. Reg. 3146 (Jan. 23, 2002). *See* PDoc[1] 157 (unpublished version). *See also Antidumping Duty Order: Stainless Steel Bar from the United Kingdom*, 67 Fed. Reg. 10381 (Mar. 7, 2002), PDoc 165. Commerce determined that FRSS had failed to act to the best of its ability by not submitting costs and expenses for subject merchandise produced and sold by Spencer Clark, an affiliate that was dismantled three months before the petition was filed. As a result, Commerce employed an adverse inference in the selection of facts otherwise available and determined a duty margin of 125.77% for FRSS. FRSS moves for remand pursuant to CIT Rule 56.2, arguing that Commerce's decision is unsupported by substantial evidence on the record or not in accordance with law. Specifically, FRSS argues that the record shows it acted to the best of its ability in providing all the data it had or could obtain with respect to Spencer Clark, that it was unlawful for Commerce to refuse to verify its responses, and that the margin from the petition selected as facts otherwise available was uncorroborated and therefore unlawful. The government and the defendant-intervenors (petitioners) argue that the final determination should be sustained. On the reasoning below, the Court denies the plaintiff's motion and grants judgment to the defendant.

---

[1] The public and confidential documents of the administrative record are herein referenced "PDoc" and CDoc," respectively.

*Background*

The petitioners' allegation of dumping of stainless steel bar ("SSB") from countries including the United Kingdom was filed on December 28, 2000. CDoc 1. The investigation into the petition was initiated January 2, 2001. *Notice of Initiation of Antidumping Duty Investigations: Stainless Steel Bar from France, Germany, Italy, Korea, Taiwan, and the United Kingdom*, 66 Fed. Reg. 7620 (Jan. 24, 2001), PDoc 17. Commerce selected the three largest producers/exporters of SSB from the United Kingdom as mandatory respondents. *See* PDoc 31. On February 20, 2001, Commerce sent antidumping duty questionnaires to each concerning their respective SSB sales in the U.S. and the U.K. over the period October 1, 1999 to September 30, 2000 (the "POI"). PDoc 38.

FRSS submitted answers to section A on March 23, 2001 and to sections B-D on April 12, 2001, and it sent cost reconciliation data for section D on May 16, 2001. PDoc 54, CDoc 8; PDoc 62, CDoc 13; PDoc 72, CDoc 18, respectively. Among other responses, in its section A responses to questions about affiliates, FRSS did not indicate that it had any which had produced and sold subject merchandise during the POI. In answer to question "6b," which requested financial documents for "all affiliates involved in the production or sale of subject merchandise in the foreign market and the U.S. market," FRSS asserted that it had "no affiliates" involved in such "during the period of investigation."

The petitioners commented that FRSS's section A-C responses were insufficient and contained, among other items, incorrectly formatted product control numbers ("CONNUMs"), incorrect or no grade codes for many sales, incorrect customer codes, incorrect shipment dates, no inventory carry costs, incorrect invoice dates and invoice numbers and incorrect destination codes.

*See* PDoc 60, CDoc 11; PDoc 65, CDoc 14. Accordingly, Commerce deemed FRSS's response(s)

"deficient and/or unresponsive" and on May 21, 2001 sent a supplemental questionnaire requesting,

among other things, data on costs and price adjustments for FRSS's SSB sales in the U.S. and the

United Kingdom. PDoc 73, CDoc 19. FRSS responded on June 11, 2001, in part:

> A short history detailing the creation of FRSS as it existed during the POI may help to explain FRSS's reporting problems. FRSS is the principle operating subsidiary of Firth Rixson plc ("Firth Rixson") engaged in the production and sale of [SSB]. FRSS was created on September 25, 1998 with the renaming of Barworth Flockton Ltd., a company acquired by Firth Rixson on December 22, 1997. Barworth Flockton did not produce [SSB]. In December 1998, Firth Rixson acquired Spartan (Sheffield) Ltd. and transferred Spartan's production capacity and sales to FRSS's site in Ecclesfield, Sheffield. On August 27, 1999, Firth Rixson acquired the Aurora Group. One company in the Aurora Group, Spencer Clark, was renamed Firth Rixson Metals Ltd. ("FRM"). On October 1, 2000, the production capacity and sales of FRM were transferred to FRSS.
>
> FRSS has thoroughly reviewed all available data for the period before and after the Aurora Group acquisition and has determined that information and data concerning many adjustments to price for sales by Spencer Clark during the POI and information and data that could be used to produce cost calculations for the Department's CONNUM-specific model simply do not exist. FRSS requests that the Department use a non-adverse facts available methodology to "fill in the blanks" for Spencer Clark information and data that were destroyed, lost, or never available prior to the filing of the petition.
>
> FRSS has made and will continue to make its best cooperative efforts to locate any information and data necessary to respond to the Department's questionnaire. But FRSS cannot provide information and data that do not exist. Sales of Spencer Clark can be identified by invoice numbers starting with "C" or "M" in the home market and "E" on sales to the U.S.

PDoc 81, CDoc 24, at 2.

At Commerce's request, on June 14, 2001, Commerce met with counsel for FRSS to discuss

FRSS's various responses. A Department memorandum of June 18, 2001 purports to summarize

the meeting. PDoc 85. Regarding FRSS's section A-C supplemental response, the memorandum notes that FRSS provided "minimal information" on SSB produced and sold by Spencer Clark during the POI. Commerce requested FRSS: (1) to "clarify what additional information might be available for reporting purposes[;]" (2) to "provide Spencer Clark's trial balances and financial statements covering the POI[;]" (3) to "report the total quantity and value of sales of SSB made by Spencer Clark in the U.S. and home markets during the POI, and what percentage of FRSS's total home market and U.S. sales they represent[;]" and (4) to clarify "the role of Firth Rixson Metals Inc. in the U.S. sales made by Spencer Clark during the POI." *Id.* at 1-2. Regarding FRSS's original section D response, the memorandum described it as "largely inadequate" and "lack[ing] the elementary detail and narrative explanations necessary for cost calculation purposes" although the "[s]pecific areas of concern were communicated through the Department's section D supplemental questionnaire that was issued on June 15, 2001." *Id*. at 2. Regarding FRSS's non-Spencer Clark responses, the memorandum noted that FRSS had to date failed to provide: (1) quantity and value reconciliations; (2) a complete explanation of its product/grade coding system; (3) chemical content information for all grades sold in the U.S. and home markets during the POI and the three most similar home-market matches for each U.S. grade sold; (4) a control number concordance; and (5) calculation worksheets demonstrating the methodology used to derive the per-unit expense amounts reported in the home market and U.S. sales listings. *See id*. at 3. Commerce provided a copy of the memorandum to FRSS on June 18, 2001 and allowed until June 22, 2001 to file a response thereto.

The supplemental section D questionnaire sent the day following the meeting with Commerce allowed FRSS until June 29, 2001 to respond.  PDoc 82, CDoc 25.  This supplemental questionnaire requested, *inter alia*, control numbers for Spencer Clark's products, its production quantities, and product-specific and average-cost figures for Spencer Clark SSB products produced and sold during the POI.  Commerce stated that it intended to use Spencer Clark's average cost as a starting point for product-specific costs. FRSS submitted responses on June 22, 2001 and June 29, 2001.  PDoc 87, CDoc 27;  PDoc 90, CDoc 29.  FRSS responded to each of Commerce's questions, but regarding Commerce's request for average cost of production for Spencer Clark SSB FRSS responded "[t]here is no way to calculate this figure from the data available to FRSS."  PDoc 90, CDoc 29, at 14.

In its July 26, 2001 *Facts Available Memorandum* written prior to publication of the preliminary determination ("*FA Memo*"), Commerce noted that Spencer Clark accounted for a certain significant percentage of FRSS's U.S. sales as well as a certain significant percentage of FRSS's home market sales of subject merchandise during the POI.  PDoc 105, CDoc 36, at 4 (footnote 4).  *See* PDoc 87, CDoc 27, at 2-3.  After reviewing Spencer Clark's trial balances and audited financial statements, Commerce determined it could not accept the claim that the data sought (*i.e.*, complete costs of production for Spencer Clark SSB products) did not exist because Spencer Clark's financial information had been reviewed and consolidated with that of FRSS and its parent by an independent auditing firm.  *Id.* at 3, referencing PDoc 54, CDoc 8, at Attachment 8.  The *FA Memo* noted that "FRSS has made no attempt to present an alternate methodology to enable the Department to calculate cost and selling expenses for [Spencer Clark's] SSB products."  *Id.* at 4.

In the preliminary determination on the investigation, Commerce considered that FRSS's latest submissions were "partially responsive" but still "lack[ing] the basic product, sales expense, and cost of production information necessary to perform the antidumping margin analysis" in reference to the missing Spencer Clark data. *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Stainless Steel Bar From the United Kingdom*, 66 Fed. Reg. 40192, 40194 (Aug. 2, 2001). Commerce concluded that an adverse inference was warranted because "FRSS failed to identify an affiliated producer of SSB which produced and sold SSB during the POI until late in the investigation, and then failed to provide basic sales and cost data for its affiliate." *Id*. As a result, Commerce selected as adverse facts available the highest margin alleged in the antidumping petition. *Id*. *See* 19 U.S.C. § 1677e(b).

On August 2, 2001, at the request of FRSS, Commerce met with counsel to discuss the preliminary determination. *See* PDoc 112. FRSS states that at the meeting, it addressed Commerce's outstanding concerns by pointing to specific responses in its prior submissions.[2] Thereafter, on August 13, 2001 Commerce issued another supplemental questionnaire to FRSS. This questionnaire asked only about matters pertaining to Spencer Clark. PDoc 114. In it, Commerce called attention to the fact that FRSS's independent auditors had opined that FRSS's financial statements had been prepared in accordance with the United Kingdom's Companies Act 1985 and that the auditors had noted that the Act requires private and public companies incorporated thereunder to retain their accounting records for three and six years, respectively, and that in forming

---

[2] Specifically, FRSS states that it pointed to pages B-25 and C-27 and Attachment 6 of PDoc 62, CDoc 13; page 22 of PDoc 81, CDoc 24; pages 1-3, 5 and Attachment 6 of PDoc 87, CDoc 27; and pages 1-14 and Attachment 6 of PDoc 90, CDoc 29.

their opinion, auditors must consider, among other things, that proper accounting records have been kept. Commerce requested FRSS to: (a) reconcile this requirement with its claim that Spencer Clark's records for the POI did not exist, (b) explain in detail why the requested Spencer Clark records do not exist, (c) explain what efforts were made to locate the company's records for purposes of responding to the Department's questionnaire, (d) provide a list of the records that are available, (e) provide a detailed list of the records that are not available, (f) provide source documentation to support a claim on the record-keeping requirements of Spencer Clark to do business in the United Kingdom and reconcile its response to this question to the claim that Spencer Clark records for the POI do not exist, and finally (g) provide a detailed list of the sales, cost and financial records that Firth Rixson plc had available to it for each company in the Aurora Group during and after the acquisition in August 1999. *Id*.

On August 20, 2001, FRSS responded by providing what it claims was "all available information" on Spencer Clark. FRSS further explained the circumstances of the Spencer Clark acquisition as part of the Aurora Group: that Spencer Clark's SSB-related turnover was an immaterial part of total Aurora Group sales and had not been considered integral to the acquisition since it was unrelated to Firth Rixson's primary forgings business; that Spencer Clark's operations continued on a limited basis (specifically, for shipment of product under pre-existing orders but not to accept new orders) as a separate, stand-alone business with the same (previous) employees and with only limited interaction with FRSS management; and that it was dismantled on or about September 30, 2000. FRSS clarified Commerce's point with respect to the unqualified opinion of the independent auditors by noting, among other things, that

> companies in the United Kingdom are required by the Companies Act 1985 to retain for a period of three to six years the general ledger, cash book, debtor and creditor ledgers, balance sheets and accounting period inventory records. It is presumed that these records existed at the time [the independent auditors] audited Firth Rixson's accounts as of September 30, 2000, prior to the filing of the petition. However, that can only be presumed from the fact that [the independent auditors] gave an unqualified opinion.

CDoc 38. The response further stated that except for Spencer Clark's trial balances, balance sheet, profit and loss account, statement of tangible fixed assets, notes on the accounts, group cash flow statement, taxation account, total cost of sales, and administrative expenses (*see* Attachment 4 to CDoc 27 and Attachment 7 to CDoc 29), it was nonetheless a "fact" that FRSS could not locate the specific cost and expense information for SSB sales that Commerce desired. *Id*.

Counsel for FRSS met again with Commerce on August 22, 2001 prior to the final determination. *See* CDoc 39. A memorandum summarizes that "treatment of . . . FRSS in the U.K. SSBar investigation" was discussed but Commerce "basically informed" counsel that it was declining to conduct verification because of the significant percentages of home market and U.S. sales for which FRSS had failed to provide complete data, *i.e.*, due to the absence of Spencer Clark SSB cost and expense data. On August 31, 2001, Commerce formally informed FRSS that in light of such missing data, there was no basis upon which to conduct verification. PDoc 122.

Subsequently, Commerce explained its full position at Comment 1 of the *Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Stainless Steel Bar from the United Kingdom* (Jan. 15, 2002) ("*Decision Memo*"), PDoc 156 at 7-11. Basically, Commerce found that FRSS had not acted to the best of its ability and determined to draw an adverse inference in selecting from facts otherwise available. Specifically, Commerce concluded that FRSS

had "provided virtually no responses to the Department's cost questions and failed to provide" a cost of production and constructed value database, *id*. at 7, and it found the "claim that [FRSS] no longer has the necessary information is contradicted by information on the record" in the form of FRSS's "access" to a "detailed sales journal" and a "product line trial balance" which FRSS could have used as a starting point to a cost response. *Id*. Commerce also believed FRSS must at some point have had the records it requested because in order to obtain "a clean audit opinion, the auditors would have had to test the allocation of production costs between cost of sales and ending inventory to ensure the proper matching of cost of sales with sales revenue[.]" Commerce concluded that at a minimum FRSS could have obtained the auditors' work papers which might have provided usable Cost of production data, and/or FRSS could have proposed an alternate method for determining Spencer Clark cost of production. *Id*.

Commerce concluded that FRSS's responses were incomplete due to their "depth and kind of information" which was of "low quality" and "unresponsive" because it was within FRSS's capacity to provide "the right kind of information" given that FRSS had "access to" the specific information aforementioned. Commerce "questioned how important business and accounting information of this nature can be 'lost' entirely, even in a company takeover scenario" because, according to Commere, "[t]his is the type of information that a company should and would keep in the ordinary course of reasonable business operations." *Id*. at 8. Commerce thus believed this to be "a situation where existing information of a material nature was made unavailable by the actions of the company itself" without offering any "credible and rational explanation of how and why" the information came to be "lost," and that even if it was "lost" FRSS had "not shown that it was unable

to respond in any way to the Department's requests for the missing information." *Id*. at 8-9. Thus, Commerce concluded that FRSS "did not want the Department to see this data relating to Spencer Clark" and that an adverse inference was justified. *Id*. at 9. In addition, Commerce disagreed with FRSS's assertion that the non-Spencer Clark deficiencies had been rectified. *Id*., referencing PDoc 105, CDoc 36 (*FA Memo*).

Commerce examined as adverse facts otherwise available the highest margin in the petition, and "corroborated" that alleged margin by comparing the price and cost data in the petition with data provided by Corus, the "other participating respondent in this investigation." *Id*. at 10. Commerce found the petition data to be "in the range" of data provided by such participating respondent and that the margin in the petition therefore has "probative value." *Id*. at 10-11, referencing Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, at 870 (1994) (adverse inferences are appropriate to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully").

On January 23, 2002, Commerce issued its final determination. This action followed.

### *Discussion*

Jurisdiction here is pursuant to 28 U.S.C. § 1581(c). To prevail in an action such as this, a plaintiff must demonstrate that the challenged agency determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).  This standard requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).  However, substantial evidence supporting the agency's determination must be based on the whole record, and a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever in the record fairly detracts from its weight." *Melex USA, Inc. v. United States*, 19 CIT 1130, 1132, 899 F.Supp. 632, 635 (1995) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 478, 488 (1951)).

## I.

FRSS argues that substantial evidence does not support Commerce's determination that it did not act to the best of its ability.  It argues that it responded to all of Commerce's requests for information during the investigation and asserts that by the time of the preliminary determination it was led to believe that all of the outstanding matters had been resolved except for Commerce's desire for SSB-specific cost and expense data pertaining to Spencer Clark.  With respect to the specific SSB data Commerce sought, FRSS states that it provided all available financial information for Spencer Clark in June 2001 and respectfully requested Commerce to "fill in the blanks" because the information was no longer available, if it ever had been.  FRSS argues that an adverse inference is unwarranted in view of its responsiveness to the requests specified by Commerce and its diligence during the investigation to comply with those requests.  Pl.'s Br. at 7, referencing *Olympic Adhesives, Inc. v. United States*, 799 F.2d 1565, 1572 (Fed. Cir. 1990) (respondent did not "refuse" or "was unable" to supply information within the meaning of 19 U.S.C. § 1677e(b) (1982) by

responding that there was no data to provide.); *Bowe Passat Reinigungs-Und Waschereitechnik GmbH v. United States*, 20 CIT 1426, 1435-36, 951 F.Supp. 231, 239 (1996) (unreasonable to penalize failure to submit data that do not exist).

Further, FRSS argues that Commerce's decision not to conduct verification was unlawful because Commerce had ample time to analyze and confirm the nonexistence of the data it sought before making a final determination. FRSS points out that its responses were not "late" but were provided one and a half months before the preliminary determination and three months before verification of exporters' responses. Lastly, FRSS challenges the antidumping duty margin that was selected from the petition as uncorroborated.

The government and the petitioners argue that there is ample evidence on the administrative record to support Commerce's decision that FRSS did not act to the best of its ability. They contend FRSS impeded the investigation with numerous erroneous responses requiring time and effort to correct or clarify. They point out that Spencer Clark should have been disclosed at the outset of the investigation in response to section A question 2 of the original questionnaire, but instead FRSS affirmatively asserted in question 6B of its March 23, 2001 response that "[t]here were no affiliates involved in the production or sale of the merchandise under investigation in the U.K." The government and the petitioners thus portray FRSS has having purposefully avoided full disclosure, and the *Decision Memo* concludes that FRSS's "inability" to comply was a situation of its own making.

Upon receipt of a request for information from Commerce, an interested party experiencing difficulty meeting the "form and manner" of such request may notify Commerce of such difficulty,

"together with a full explanation and suggested alternative forms in which such party is able to submit the information[.]" 19 U.S.C. § 1677m(c)(1).  Upon receipt of such notification, Commerce is required to "consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party." *Id*.  Commerce is required to "take into account any difficulties experienced by interested parties, particularly small companies, in supplying [the requested] information" and also to "provide to such interested parties any assistance that is practicable in supplying such information." 19 U.S.C. § 1677m(c)(2).  If Commerce "determines that a response to a request for information "does not comply with the request," Commerce must "promptly inform the person submitting the response of the nature of the deficiency" and it must also, "to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of [the] investigation[.]"  19 U.S.C. § 1677m(d).  If the interested party submits further information in response to a notice of deficiency, and Commerce "finds that such response is not satisfactory," then Commerce "may, subject to subsection (e) of this section, disregard all or part of the original and subsequent responses." 19 U.S.C. § 1677m(d).  The referenced subsection (e) provides that in an investigation such as this, Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by" Commerce if the information "is submitted by the deadline established for its submission," "can be verified," "is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination," "can be used without undue difficulties[,]" and "the interested party has demonstrated that it acted to the best of

its ability in providing the information and meeting the requirements established by [Commerce] . . . with respect to the information[.]" 19 U.S.C. § 1677m(e)(1)-(5).

A determination on the margin must be made regardless of the information available at the administrative proceeding. 19 U.S.C. § 1677e(a). Commerce must use "facts otherwise available" where (1) necessary information is not available on the record, or (2) where an interested party (A) withholds requested information, (B) fails to provide it timely or in the form and manner requested (subject to 19 U.S.C. §§ 1677m(c)(1) and (e)), (C) significantly impedes the proceeding, or (D) provides the requested information but it cannot be verified as provided in 19 U.S.C. § 1677m(i). *Id*. The use of facts otherwise available under all of these situations is expressly subject to the limitations of section 1677m(d), *id*., however, if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information[,]" Commerce is also permitted to draw an adverse inference. 19 U.S.C. § 1677e(b).

If Commerce draws an adverse inference, Commerce must clearly articulate the finding that a party failed to act to the best of its ability and clearly articulate why the missing information is significant to the progress of the proceeding. *See*, *e.g.*, *Nippon Steel Corp. v. United States*, 24 CIT 1158, 1169-70, 118 F.Supp.2d 1366, 1378 (2000); *Ferro Union, Inc. v. United States*, 23 CIT 178, 200, 44 F.Supp.2d 1310, 1331 (1999). Commerce's explanation must include a determination that an interested party "could comply, or would have had the capability of complying if it knowingly did not place itself in a condition where it could not comply[,]" and that the failure to comply was either willful or below the standard expected of a reasonable respondent. 24 CIT at 1171, 118 F.Supp.2d at 1379. *See*, *e.g.*, *Borden, Inc. v. United States*, 22 CIT 233, 264, 4 F.Supp.2d 1221, 1246 (1998),

*opinion after remand*, 22 CIT 1153 (1998), *aff'd sub nom. F.lli De Cecco di Filippo Fara S. Martino S.p.A v. United States,* 216 F.3d 1027 (Fed. Cir. 2000).

As described in the *Decision Memo*, Commerce's decision to employ an adverse inference was cumulative. In articulating that FRSS had not acted to the best of its ability, Commerce stated that FRSS submitted evasive and incomplete responses, and in particular failed to provide cost and expense data for Spencer Clark, did not explain why it could not do so, and failed to provide an average cost figure for use as a "starting point" for Spencer Clark SSB costs and expenses.

The government and the petitioners raise the point that Commerce provided "numerous" opportunities to FRSS to respond via supplemental questionnaires and meetings with counsel over the course of the investigation. FRSS emphasizes that this was its first U.S. international trade law proceeding, that a respondent's unfamiliarity with such proceedings is to be considered, that clarification and correction of responses is a normal part of the administrative procedure, and that the alleged "other-than-Spencer-Clark" deficiencies are "red herrings" because they were each addressed at the August 2, 2001 meeting with Department officials. Pl.'s Reply, referencing Pl.'s Br. at 3-4 & App. Tabs 4-7.

Accuracy in the margin determination is an ideal of U.S. international trade law. *See, e.g.*, *Rubberflex SDN. BHD v. United States*, 23 CIT 461, 469, 59 F.Supp. 1338, 1346 (1999). Towards that end, "it is essential that a respondent provide Commerce with accurate, credible, and verifiable information" via its questionnaire responses. *Gourmet Equipment (Taiwan) Corp. v. United States*, 24 CIT 572, 574 (2000). *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed. Cir. 1994) (cooperation of interested parties is essential to determination of accurate dumping margins

within "extremely short statutory deadlines"); *Carpenter Technology Corp. v. United States*, Slip Op. 02-77 (CIT 2002) at 10 ("If a request from Commerce is unclear, it is incumbent upon parties to assist the administrative process and clarify the precise information sought."). It is also essential that Commerce fulfill its statutory duties to provide assistance to interested parties to the administrative proceeding as circumstances require. *See* 19 U.S.C. § 1677m(c) & (d). Whether a party has complied with a request for necessary information is a matter within Commerce's discretion,[3] but since the nature of investigation is to proceed from the general to the specific, as information is uncovered,[4] the appropriate exercise of that discretion must involve consideration not only of the directness of the response but of the clarity of the question(s) posed. Commerce must provide "meaningful opportunity" to respond to an allegedly deficient response. *E.g.*, *China Steel Corp v. United States*, Slip Op. 03-52 (CIT 2003); *Am. Silicon Tech. v. United States*, 24 CIT 612, 624-25, 110 F.Supp.2d 992, 1003 (2000); *Mitsui & Co. v. United States*, 18 CIT 185, 202 (1994).

---

[3] *E.g.*, *Allegheny Ludlum Corp. v. United States*, 24 CIT 1424, 1441, 215 F.Supp.2d 1322, 1338 (2000); *Helmerich & Payne, Inc. v. United States*, 22 CIT 928, 931, 24 F.Supp.2d 304, 308 (1998); *Daido Corp. v. United States*, 19 CIT 853, 861, 893 F.Supp. 43, 49-50 (1995).

[4] *See*, *e.g.*, *Antidumping Manual*, Ch. 4, part III ("Supplemental Questionnaires") (DOC/IA) (Jan. 22, 1998) at 15:

> The antidumping duty questionnaire presented to respondents in the early stages of the investigation or administrative review is generally not our sole request for information. A review of just about any case file will normally uncover a number of requests for further information. These requests are generally sent out to obtain information previously requested and not received, to clarify information submitted . . . , or to obtain new information based on data submitted or changed circumstances of the investigation or review.

The August 9, 2001 memorandum of the August 2 meeting between FRSS and Commerce to discuss the *FA Memo* indicates that counsel pointed to specific responses that the *FA Memo* claimed were deficient with respect to sales made by FRSS,[5] and counsel asked Commerce to "explain the additional information required." PDoc 112. "Counsel for FRSS also requested that the company be given the opportunity to place additional information on the record in response to the Department's questionnaire." *Id.*[6] Subsequently, in the *Decision Memo*, Commerce disagreed that all of the non-Spencer Clark issues had been resolved completely and noted that FRSS reported incomplete chemical content information for each grade sold in the U.S. and home markets during the POI, incomplete most-similar grade match information, insufficient narrative for cost calculations, and no cost information for certain products (CONNUMs) in its U.S. sales listing. PDoc 156 at 10, referencing PDoc 105, CDoc 36 (*FA Memo*). Commerce insisted on a clear explanation of what happened to the Spencer Clark data it sought and why it could not be located, yet in light of FRSS's request for explanation of what additional information would be required and the August 13 supplemental questionnaire from Commerce, which addressed only matters pertaining to Spencer Clark and made no mention of the outstanding non-Spencer Clark matters, *see* PDoc 114, Commerce failed to provide a clear explanation of why FRSS's response(s) to date on non-Spencer Clark matters continued to be deficient. *See* 19 U.S.C. § 1677m(d) (Commerce "shall promptly inform the person submitting the response of the nature of the deficiency . . . .").

---

[5] *See supra*, footnote 2. *See also* PDoc 147 (FRSS's *Case Brief*), CDoc 56, at 3-4.

[6] The memorandum next summarizes that counsel for FRSS and Department officials also discussed the matter of the outstanding necessary Spencer Clark information. PDoc 112.

Whether these "other" issues were material to the finding that FRSS had not acted to the best of its ability, the capstone of that finding concerned FRSS's responsiveness over matters concerning Spencer Clark. FRSS emphasizes that it did not have the ability to provide the requested SSB-specific cost and expense data. Both Commerce and FRSS presume that FRSS's audit would have included or covered sales of the Spencer Clark SSB product line, and the government references *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002),[7] to argue that FRSS had an obligation to maintain Spencer Clark's records. *See also Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1983) (citation omitted) ("The burden of production should belong to the party in possession of the necessary information."). However, the circumstances of this matter pertain to the initial investigation, which was begun approximately three months after Spencer Clark was permanently dismantled. During that interval, FRSS did not have "legal" notice indicating the need to retain and preserve any data of Spencer Clark which might specifically pertain

---

[7] In *Ta Chen*, the outstanding antidumping duty order subjected Ta Chen to periodic review of exports of stainless steel pipe to the United States since 1992. *Amended Final Determination and Antidumping Duty Order; Certain Welded Stainless Steel Pipe From Taiwan*, 57 Fed. Reg. 62300 (Dec. 30, 1992). The issue challenged by Ta Chen in court involved amendment of the definition of "affiliate" for purposes of the antidumping statute by the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat 4809 (1994) effective January 1, 1995. *Compare* 19 U.S.C. § 1677 (33) (2000) *with* 19 U.S.C. § 1677 (13) (1988). The change in definition effected Ta Chen's statutory relationship with Sun Stainless, Inc., which was sold to third parties during the latter part of the third administrative review period. Administrative review of that period was initiated in 1996, and resulted in a finding of noncompliance against Ta Chen for failure to supply sales data for Sun. Ta Chen was successful in challenging that ruling in court, but when the matter was remanded to Commerce and Ta Chen sought to obtain the sales data from Sun, Sun's new owners refused to comply with the request. Ultimately, on appeal, the majority of the appellate panel sustained partial adverse facts available against a respondent for not inducing its former affiliate under new ownership to provide information sought by Commerce concerning the affiliate's prior business. Judge Gajarsa's noteworthy dissent criticizes the decision for "conclud[ing] that Commerce may penalize importers for failure to engage in divination." *Ta Chen*, 298 F.3d at 1340 (Gajarsa, J., dissenting).

to SSB production costs, and FRSS explained in response to Commerce's August 2 supplemental questionnaire that the Companies Act 1985 did not require retention of such particular data, if it ever existed. This is not an "unsubstantiated assertion," and there is nothing of record to support Commerce's rejection of FRSS's characterization of U.K. law. *Ta Chen* is inapplicable.

The petitioners also called Commerce's attention to their announced intention to file a dumping petition in the September 25, 2000 issue of *Metal Bulletin*,[8] and they imply that FRSS thereby received implied or actual notice before the petition was filed and sought to avoid disclosure of the sought-after Spencer Clark data as a consequence of publication. FRSS had asserted that Spencer Clark had been operated as a stand alone business and amounted to an insignificant aspect of FRSS's global consolidated operations, and that when Spencer Clark was finally transferred to FRSS it was dismantled, its site vacated, personnel discharged, computers turned off, file cabinets emptied, and production capacity sent to a subsidiary of FRSS. *See* PDoc 147 (FRSS *Case Brief*), CDoc 56, at 6-7 (citation omitted). The petitioners emphasized to Commerce that FRSS never explained *why* the data were lost or where they went. Commerce agreed that FRSS's explanation was unsatisfactory and inferred that the data it sought ought to constitute the type of business information that is fundamental to company operations and should therefore have been retained as a matter of sound business practice.

FRSS contends that the reasoning does not apply to an operation that is being wound down and will no longer be a going concern. The record shows that Spencer Clark was dismantled by September 30, 2000 and that rationalization of Spencer Clark had been ongoing since FRSS acquired

---

[8] *See* PDoc 153, CDoc 60, Attachment A.

the Aurora Group, as evidenced by the fact that Spencer Clark had taken on no new orders during the POI but only serviced existing contracts. *Cf.* CDoc 27 ("Notes of the accounts") n.26 ("Exceptional items . . . Rationalisation – specific"). If FRSS's business focus is forgings and not SSB products, as a matter of document retention FRSS's explanation would not be unreasonable and would be consistent with its description of Spencer Clark as having been continued as a separate, stand-alone business with its same (previous) employees and with only limited interaction with FRSS management. And yet, as an affiliate consolidated in FRSS's financial statements, Spencer Clark is presumed to have been under FRSS's operational control.[9] There is nothing of record from which to infer that FRSS is uninterested in SSB business and/or to negate the presumption of operational control to the extent that a reviewing court could agree with FRSS that it might otherwise justifiably plead ignorance of Spencer Clark's product line operating costs. As the finder of fact, Commerce is entitled to consider what information a reasonable business manager would be expected to retain, maintain, or know in, or as the result of, the ordinary or extraordinary course of business, and the Court is not free to disagree. *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). But, as a matter of law and based on the administrative record at hand, the failure to provide the *specific* data Commerce sought did not amount to "willful" noncompliance or equate to an ability to comply

---

[9] The definition of "affiliate" under U.S. international trade law implicates operational control. *See* 19 U.S.C. § 1677(33) ("affiliated" and "affiliated persons" are "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person" or "[a]ny person who controls any other person and such other person" and "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."). *See also* 19 C.F.R. § 351.102(b) (2001).

with the request.  The *Decision Memorandum*'s reasoning behind such failure amounts to gratuitous speculation.

The *Decision Memo* faults FRSS for failing to estimate SSB cost of production based upon available information.  In turn, the *Decision Memo* may be faulted for assuming the existence of such a journal, which FRSS claims was never maintained.  It may also be faulted for stating that the Spencer Clark financial information reveals total cost of sales "by product line," which implies breakout figures for separate product lines (SSB and others), whereas the record information reveals only total cost of goods sold.  *Cf.* CDoc 24 at Attachment 4 (profit/loss account). Furthermore, as FRSS points out, Commerce's proposed solution would yield neither a product-specific nor an average cost. "Dividing a single, aggregated, inseparable cost figure containing subject and non-subject products by a quantity of subject and non-subject products would yield a single, simple average cost for subject and non-subject products.  This information would be useless." Pl.'s Br. at 12.

An administrative decision may be sustained despite "less than ideal clarity if the agency's path may be reasonably discerned[.]" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  Because FRSS submitted sales data for subject merchandise, Commerce concluded that FRSS could quantify non-subject merchandise just as well, and therefore Commerce may have believed it was possible to derive an average SSB cost using the total cost of goods sold figure on some *pro rata* basis. But if that was the point, Commerce ought to have renewed such a request at the meeting of August 2, 2001 and/or in the supplemental questionnaire to FRSS on August 13, 2001 or otherwise have afforded FRSS the chance to remedy a potential deficiency based

on misunderstanding. The record shows that Commerce was provided the relevant financial information for Spencer Clark in June 2001, it made the request for average Spencer Clark SSB cost in the June 15, 2001 supplemental questionnaire, and it was further aware that FRSS experienced difficulty in complying with that request in light of FRSS's response (based on its apparent belief) that "[t]here is no way to calculate this figure from the data available to FRSS." PDoc 90, CDoc 29, at 14. FRSS responded substantively to Commerce's August 13 questions on August 20, 2001 and provided what it asserted was "all available information" on Spencer Clark, but the August 13 questions focused on the disposition of the missing Spencer Clark data, *e.g.* requesting FRSS to "reconcile" its claims in light of Commerce's belief that FRSS was able to provide the missing Spencer Clark data. Again, clarity in the request for information is prerequisite to determining insufficiency in the response,[10] and Commerce ought to have indicated in that final request the method it had in mind for calculating average SSB production costs and expenses or otherwise provided assistance on determining the "starting point," in order to afford FRSS the opportunity to remedy a prior deficiency.[11] Even still, asks FRSS,

---

[10] *I.e.*, Commerce is under statutory obligation to "consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party[,]"19 U.S.C. § 1677m(c)(1), to "take into account any difficulties experienced by interested parties . . . in supplying [requested] information[,]" 19 U.S.C. § 1677m(c)(2), and to "provide to such interested parties any assistance that is practicable in supplying such information." *Id.*

[11] As mentioned, in the final supplemental questionnaire to FRSS Commerce focused mainly upon "reconciliation" of FRSS's claim that it could not provide requested data with their presumed existence at the time of independent audit. Commerce requested FRSS to explain why the requested Spencer Clark records do not exist and what efforts were made to locate the company's records and provide lists of the records that are available and those that are not available, substantiate business record-keeping requirements in the United Kingdom, and provide a detailed list of the sales, cost and

(continued...)

> The question is: a "starting point" for what?  FRSS informed Commerce that the Spencer Clark [submitted] financial data . . . contained aggregated, inseparable data that include subject and non-subject merchandise including "tool and high speed steel, carbon and manganese steels, alloy and superalloys, nimonics, titanium, stainless steels, plus . . . hirework on a variety of customer's [*sic*] own materials."
>
> * * *
>
> . . . FRSS has repeatedly informed Commerce, there are no Spencer Clark accounting records of raw materials usage, scrap quantity or values, labor hours per unit of product produced, energy usuage per unit of product produced, machine hours per unit of product produced, yield factors, or any of the other records that a respondent needs in order to produce a product-specific cost or even an average cost for [the] broade[st] group[ing] of subject merchandise.

Pl.'s Br. at 12, referencing CDoc 29.

The foregoing adequately addresses FRSS's *inability* to comply with requests to provide the *specific* data sought, but Commerce's decision that FRSS did not act to the best of its ability is also underpinned by certain other noncompliance issues, including failure to attempt contact with its auditors (whose audit work papers might have yielded usable cost of production data) and failure to do more than merely assert that FRSS interviewed ex-Spencer Clark employees in search of the information Commerce requested.  FRSS's brief states that Commerce does not accept average costs for subject merchandise and that it would still have been impossible, based upon "imagination" or available financial information, to determine realistic product-specific or average SSB costs, and therefore its apparent response is that such exercise would have been futile.  *See* Pl.'s Br. at 13 (referencing *Light Walled Welded Rectangular Carbon Steel Tubing From Taiwan: Final Results of Antidumping Duty Administrative Review*, 57 Fed. Reg. 24464, 24465 (June 9, 1992)).

---

[11] (...continued) financial records that Firth Rixson plc had available to it for each company in the Aurora Group during and after the acquisition in August 1999.

On the one hand, Commerce did not make such specific requests of FRSS. On the other hand, Commerce indicated to FRSS that it intended to use average cost as a "starting point" on June 15, 2001. PDoc 82, CDoc 25. If FRSS considered that its short response on the subject to Commerce would end the matter, it underestimated the purpose of the proceeding and the significance of Spencer Clark's SSB sales to accurate determination of its margin. Whether or not ex-Spencer Clark employees would have been in a position to "fill the gaps" on Spencer Clark's SSB production costs and expenses and/or useful cost-of-production data could have been obtained from the auditors' work papers, Commerce concluded that FRSS should have been motivated to support its position by providing more documentation for the administrative record. FRSS's argument that it acted to the best of its ability would have been strengthened had it produced even a list of the ex-Spencer Clark employees it had interviewed or a statement from its auditors regarding examination of Spencer Clark's costs of SSB sales.[12] *See* PDoc 116, CDoc 38, at 5.

In addition, Commerce was clearly troubled by the fact that FRSS first disclosed Spencer Clark "late in the investigation," as characterized by the government. Def.'s Memo at 13. FRSS argues that the information was submitted "early in the investigation" because it was submitted two months prior to the preliminary determination, three months prior to U.K. verification, and nearly seven months prior to the final determination. Pl.'s Reply at 3. The flip-side of that point is the fact

---

[12] FRSS also notes that adverse facts available are intended to serve as a deterrent against non-cooperative parties for withholding data in future proceedings and argues the use of adverse facts available cannot serve as a deterrent in this situation because FRSS is not "withholding" data and in subsequent proceedings any data relating to Spencer Clark will not be an issue. Pl.'s Br. at 19-20 (referencing *inter alia Krupp Thyssen Nirosta GmbH v. United States*, Slip Op. 01-84 at 7 (CIT 2001)). That is likely true, but the argument does not address Commerce's broader consideration of FRSS's general cooperation.

that FRSS's disclosure occurred nearly five months after initiation of the investigation, but, be that as it may, FRSS does not adequately address the reasons for its original misstatement and its subsequent *volte face*. Commerce's interpretation of contradictory responses is a matter within its discretion.

Obviously, the absence of complete cost and expense data posed a serious problem for the accurate determination of the margin. FRSS may not have had the ability to provide the *specific* data Commerce sought,[13] but based upon the overall administrative record of the issue, the Court is constrained to conclude that substantial evidence supports Commerce's determination that FRSS did not, in accordance with 19 U.S.C. § 1677e(b), demonstrate that it acted to the best of its ability to work with Commerce on a solution to overcome the problem. *Cf.* 19 U.S.C. § 1677m(e)(4).

II.

FRSS also argues that Commerce's decision not to conduct verification of FRSS's responses was unlawful. The Court rejects the argument. 19 U.S.C. § 1677m(i)(1) requires Commerce to verify "all information" relied upon in making a final determination in an investigation. Positive proof of the nonexistence of the requested Spencer Clark data may be a logical impossibility, but it was nonetheless incumbent upon FRSS to make out a *prima facie* case for verification. *Cf. Industrial Fasteners Group, Am. Importers Ass'n v. United States*, 710 F.2d 1576, 1582 n.10 (Fed. Cir. 1983) ("In the absence of such information making at least a *prima facie* case as to India's proper establishment of the CCS payments, ITA did not have to verify the information supplied by

---

[13] FRSS also asserted that it spent tens of thousands of dollars in search of the requested data. If so, that is regrettable, because an interested party should never have to expend unreasonable time or sums on a Sisyphian exercise.

India."). In view of the significance of Spencer Clark's SBB sales to the investigation and the lawfulness of the decision to draw an adverse inference, substantial evidence on the record supports Commerce's determination that verification was unnecessary.

## III.

Lastly, FRSS argues that even if an adverse inference is permissible, Commerce failed to determine a reasonably accurate and appropriate margin because Commerce merely assigned to it the highest margin from the petition instead of properly analyzing the data FRSS submitted. FRSS argues the petition margin was uncorroborated and bears "no resemblance to the realities of the marketplace." Pl.'s Br. at 18. It contends that Commerce had "extensive" information provided by other respondents in this and concurrent investigations and that a margin 28 times higher than the margin imposed on the other respondent in this investigation is unreasonable. *Id.* at 20.

An adverse inference permits Commerce to rely on information derived from the petition, the final determination, a previous review or any other information placed on the record. 19 U.S.C. § 1677e(b). When Commerce relies on information other than information obtained during the course of the investigation or review, Commerce must, "to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). *See Borden, Inc. v. United States*, *supra*, 22 CIT at 264-65, 4 F.Supp.2d at 1247. The adverse facts selected must be "rationally related to sales, indicative of customary selling practices, and not unduly harsh or punitive." *Krupp Thyssen Nirosta GmbH v. United States*, Slip Op. 01-84 at 7 (CIT 2001).[14]

---

[14] Commerce has "discretion to choose which sources and facts it will rely on to support an adverse inference" but its "discretion in these matters . . . is not unbounded." *F.lli De Cecco di Filippo Fara S. Martino S.p.A, supra,* 216 F.3d at 1023. The Court of Appeals for the Federal

(continued...)

In *Borden*, *supra*, this Court was skeptical that certain margins from that petition were useable because Commerce had found them "high" for all parties whose data had been verified and because the "possibility" that the respondent's "true" margin may be in the high end of the range was merely an unsupported inference. 22 CIT at 265, 4 F.Supp.2d at 1247. Commerce did not make such a finding here. After comparing the petition's price and cost data with data provided by Corus (the "other participating respondent in this investigation"), Commere found the petition data to be "in the range" of the unverified data provided by Corus and therefore of "probative value." PDoc 156 at 10-11. That is, Commerce corroborated by choosing a particular SSB product's sales alleged in the petition and comparing the ranges for constructed value ("CV") and other home market pricing and constructed export price ("CEP") or export price ("EP") pricing for the U.S. market against the respective ranges of such values from the unverified data provided by Corus for such product. CDoc

---

[14] (...continued)
Circuit stated in that case,

> the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins. . . . It is clear from Congress's imposition of the corroboration requirement in 19 U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin. Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.

*Id*. (citation omitted). *See Am. Silicon Technologies v. United States*, 240 F.Supp.2d 1306 (2002).

36 at 7-8. For the final determination, Commerce re-examined the price and cost information in light of information developed during the investigation and "continued to find that the rates contained in the petition have probative value." 67 Fed. Reg. at 3148.

In other words, Commerce corroborated the highest petition rate via inductive reasoning. Since Crownridge did not participate in the proceeding, it appears that Commerce has done what it could to "corroborate that information from independent sources that are reasonably at [its] disposal" to the extent practicable. *See* 19 U.S.C. § 1677e(c). FRSS has not suggested what other method might have been employed to prove or disprove.

### *Conclusion*

Taking into consideration the final less-than-fair-value determination with respect to FRSS as a whole, the Court must conclude that FRSS has not met its burden of proving that there is not substantial evidence to support the determination or that it is otherwise not in accordance with law. In the absence of such proof, the determination must be sustained.

_____
                    R. KENTON MUSGRAVE, JUDGE

Dated: June 27, 2003
       New York, New York